873 A.2d 511 (2005)
183 N.J. 308
STATE of New Jersey, Plaintiff-Respondent,
v.
R.B., Defendant-Appellant.
Supreme Court of New Jersey.
Argued September 14, 2004.
Decided May 23, 2005.
*514 J. Michael Blake, Assistant Deputy Public Defender, argued the cause for appellant *515 (Yvonne Smith Segars, Public Defender, attorney; Mr. Blake and William P. Welaj, Designated Counsel, on the letter briefs).
Russell J. Curley, Deputy Attorney General, argued the cause for respondent (Peter C. Harvey, Attorney General of New Jersey, attorney).
Justice RIVERA-SOTO delivered the opinion of the Court.
Following a retrial after his first jury was unable to agree on a verdict, defendant R.B. was convicted of various sexual abuse offenses involving his six-year-old stepson. On appeal to the Appellate Division, R.B. raised a number of challenges to both his convictions and sentence. The Appellate Division affirmed R.B.'s conviction but remanded for the imposition of a concurrent term on count three of the indictment rather than the consecutive term imposed by the trial court. R.B. raises before us the same challenges to his convictions that he presented to the Appellate Division.
We hold that:
(a) the trial court properly admitted the six-year-old victim's statement to the police under the tender years exception to the hearsay rule, N.J.R.E. 803(c)(27);
(b) the victim's statement to his mother qualified for admission under the tender years exception to the hearsay rule and, therefore, the objection to that statement as not qualifying as a "fresh complaint" is irrelevant;
(c) the trial court's charge sufficiently informed the jury concerning the limited and proper use of the Child Sexual Abuse Accommodation Syndrome;
(d) the cumulative use of the six-year-old victim's "fresh complaint," together with expert testimony concerning the Child Sexual Abuse Accommodation Syndrome, was harmless error; and,
(e) the prosecutor's remarks in summation did not constitute prosecutorial misconduct.[1]
As a result, we affirm the judgment of the Appellate Division affirming R.B.'s convictions.[2]

I.

A. Factual Background.

R.B. and K.B. were married and living in Jersey City. During the summer of 1998, R.B., K.B. and their two-year-old baby daughter were joined by C.R., K.B.'s six-year-old son from a prior relationship. From the beginning, C.R. was a difficult child, but over the following year the boy's behavior progressively deteriorated. C.R. began torturing the family cat, set a rug on fire, and once defecated in the cat's litter box.
In August 1999, R.B. and K.B. separated, although they remained on speaking terms and even discussed reconciliation. In the interim, C.R.'s behavior worsened. *516 On September 21, 1999, after C.R. threw food and punched his then three-year-old sister, K.B. sought guidance from her mother and, at her mother's suggestion, asked C.R. if anyone had inappropriately touched him while he was living with his grandfather or uncle. C.R. initially denied any inappropriate touching, but then implied that his natural father, C.R., Sr., once touched him inappropriately. When K.B. continued to question C.R., he retracted his statement about his natural father and, instead, stated that R.B. inappropriately touched him.
K.B.'s mother contacted the police, and C.R. was taken to the Sexual Assault Victim's Assistance Unit (SAVA) in Jersey City. Sergeant Spirito and Detective Hadfield interviewed the child for approximately one hour and fifteen minutes, following which they took a fifteen minute taped statement. In that statement, C.R. said that R.B. forced C.R. to "put [C.R.'s] mouth on [R.B.'s] private part, and [R.B.'s] mouth on [C.R.'s] private part...." C.R. also explained that R.B. had "peed" in C.R.'s mouth, which was understood as a reference to R.B. having ejaculated in C.R.'s mouth. In his taped statement, C.R. provided Sergeant Spirito and Detective Hadfield with detailed information about several instances of sexual abuse by R.B., including where and when those events occurred.
While Sergeant Spirito and Detective Hadfield were interviewing C.R., R.B. arrived at the SAVA Unit and agreed to answer questions. Immediately after concluding C.R.'s taped statement, Detective Hadfield and Lieutenant Domanski went to the interview room, where R.B. was being held, to question him. Detective Hadfield advised R.B. of his Miranda rights, Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). R.B. signed a written waiver of those rights and spoke with the police. He initially denied C.R.'s allegations of abuse. Ultimately, R.B. stated that he had "possibly" touched C.R.'s genitalia, but then R.B. added that he suffered from blackouts and could not recall if he did.

B. The Charges, Trial and Appeal.

On April 10, 2000, a Hudson County Grand Jury returned a four-count indictment charging R.B. with first-degree aggravated sexual assault, N.J.S.A. 2C:14-2a (count one); second-degree sexual assault, N.J.S.A. 2C:14-2b (count two); second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4a (count three); and the disorderly persons offense of child abuse, N.J.S.A. 9:6-1 and 9:6-3 (count four).
On January 29, 2002, before empanelling the jury, the trial court conducted a hearing pursuant to N.J.R.E. 104 to consider the admissibility of both C.R.'s statements to his mother and to the SAVA Unit under the tender years exception to the hearsay rule, as provided by N.J.R.E. 803(c)(27), and R.B.'s post-arrest statement to the police. After a full examination, the trial court ruled the three statements admissible. Trial commenced the next day and continued until February 8, 2002, when the court declared a mistrial as a result of a hung jury. At the second trial, which started on May 7, 2002, R.B.'s defense, other than his cross-examination of the prosecutions proofs, consisted of one character witness. On May 9, 2002, the jury returned guilty verdicts against R.B. on all four counts of the indictment.
When R.B. was sentenced on September 3, 2002, the trial court merged the conviction for second-degree sexual assault (count two) into the first-degree aggravated sexual assault conviction (count one), and the disorderly persons offense of child abuse conviction (count four) into the second-degree endangering the welfare of a *517 child conviction (count three). On the merged sexual assault charges, R.B. was sentenced to eighteen years incarceration with a nine-year period of parole ineligibility; on the endangering the welfare of a minor merged charges, R.B. was sentenced to seven years incarceration with a three-year period of parole ineligibility. The trial court ordered the separate terms of incarceration to run consecutively, resulting in an aggregate twenty-five year term of imprisonment with a twelve-year period of parole ineligibility, and the assessment of an aggregate of $2,180 in penalties.
Before the Appellate Division, R.B. attacked both his convictions and sentence. The Appellate Division affirmed R.B.'s convictions, but remanded for the imposition of concurrent terms on the merged charges.
We granted certification. 178 N.J. 454, 841 A.2d 92 (2004). For the reasons that follow, we affirm the judgment of the Appellate Division.

II.
We begin our analysis of R.B.'s assignments of error by addressing first his evidentiary objections: that the trial court should not have admitted the statements of C.R., R.B.'s six-year-old stepson, to both his mother and the police under the tender years exception to the hearsay rule, and that the trial court should not have allowed C.R.'s mother, K.B., to testify concerning C.R.'s identification of R.B. as his sexual assailant because C.R.'s identification does not qualify as a "fresh complaint." As the record amply demonstrates, the admission of those statements was proper under the tender years exception to the hearsay rule, rendering irrelevant whether the statements also were admissible under the "fresh complaint" exception, which "permits proof that the violated victim complained within a reasonable time to someone she would ordinarily turn to for sympathy, protection and advice." State v. Balles, 47 N.J. 331, 338, 221 A.2d 1 (1966).
A hearsay statement by a child under the age of twelve, relating to sexual misconduct against that child, may be admitted at trial under the tender years exception when there has been notice of intention to use the hearsay statement, a pre-trial judicial finding of trustworthiness, and either the opportunity to cross-examine the child at trial or corroborating proof of the act of sexual abuse. N.J.R.E. 803(c)(27).[3] Applying these three requirements here, we note first that the trial court properly found that the State provided appropriate notice to the defendant of its intention to use C.R.'s statements to his mother and to the police.
Second, as a result of the proofs adduced in the Rule 104 hearing, the trial court found that the time, content and circumstances of the statements demonstrated a sufficient probability of trustworthiness to justify their admission. After listening to the child's tape recorded statement as well as the testimony of the child's mother and the officer who secured the tape recorded statement, the trial court stated:
Sergeant Spirito  well, I'll make the following findings of fact in any event. Sergeant Spirito testified quite clearly and unequivocally, and I don't believe *518 it's seriously contested by anyone that on the  during the early morning hours of September the 22nd the child, the alleged victim in this matter, along with his mother, were brought to the SAVA offices of the Hudson County Prosecutor's Office, for the purpose of being interviewed regarding allegations of sexual abuse of the child.
She testified and I find this a fact that she had a pre-interview with the mother to obtain some basic information, family information, and the general nature of the allegation. There was no specific inquiry as to dates, times, places, etcetera, and the nature of the acts engaged in.
That topic was broached for the first time by [Sergeant] Spirito with the child, according to her testimony, during her pre-interview with the child, following a lengthy period of  after attempting to put the child at ease for about 20 minutes of the hour or so that she spent with the child.
Although the time the statement was taken was late in the morning for a child, I'm satisfied and find as credible [Sergeant] Spirito's testimony that the child was awake, aware, and alert, at the time the statement was given.
As far as the content of the statement is concerned, it's abundantly clear from listening to the tape that the child at the time he gave the statement was immature. He is at the time of the giving of the statement a seven year old child, and he appears to be age appropriate, meaning there were  there was a kind of a lilting tone to his responses, and it was almost as if he did not understand the nature of the violation that he allegedly was subjected to.
It's clear that there had been no detailed discussion regarding anatomical features. He did not refer to the defendant's conduct in terms of oral sex, nor did he refer by any anatomically correct names to the genitalia involved in the allegation.
Rather he said specifically that the defendant had forced him to put his mouth, the child's mouth, on the defendant's private parts, and that the defendant had placed his private  his mouth on the child's private parts.
It's also, I think, quite telling that the child referred to what I think fairly is referred as ejaculate as pee, being unfamiliar with the anatomical reproductive functions of an adult male that would be something that a young male child would be familiar with, and perhaps the only thing he'd be familiar with is the fact that a penis is also used to void fluid.
Finding that K.B.'s questioning of the child, which originally elicited the damaging statement from the child, was not improper under the circumstances, the trial court concluded that "the statement satisfies the criteria set forth in the rule and it does have a high probability of trustworthiness based upon the factors ... explained, and [the court was] satisfied the statement should be admissible under Rule 803(c)(27)."
We concur with the trial court's findings concerning the truthfulness of C.R.'s pretrial recorded statement. We agree that the child's language and affect  under both direct and cross-examination  was age appropriate and bore no indicia of coaching. Thus, for example, at trial the child testified as follows:
Q When you lived with your mom and [R.B.], would you say that your behavior was good or bad?
A Kind of both.
....
Q.... What did [R.B.] do?
A He stuck his private in my mouth.

*519 Q His private? Now when you say his private, do you think you can stand up and show me on your body where that is? Could you do that for me?
A Down here.
Q Down here?
THE COURT: The record will reflect the witness has indicated his genital area.
Q And what did he do with his private area?
A He stuck it in my mouth.
....
Q He did it other times? How many times would you say he did it if you remember?
A A few, I'm not sure the number.
Q A few times? When he did it the other times, what  what did he do the other times?
A He did the same thing.
Q And what  what was that?
A He put his private in my mouth.
Q Did he do anything else?
A He peed in my mouth.
Because R.B. interposed no objection to the admission of C.R.'s taped statement to the police at trial, and because C.R.'s testimony bore sufficient indicia of truthfulness, the second requirement for admissibility under the tender years exception to the hearsay rule is met.
Third, and last, the final requirement is easily satisfied as C.R. testified at trial and was cross-examined on both his pre-trial and trial statements.
We find that the requisite elements for admissibility of C.R.'s pre-trial statements under the tender years exception to the hearsay rule were present and that the trial court's ruling admitting C.R.'s pretrial statements to his mother and to the police implicating R.B. as his sexual abuser should not be disturbed.
R.B. also claims that allowing C.R.'s mother, K.B., to testify concerning C.R.'s identification of R.B. as his sexual assailant was improper because C.R.'s identification of R.B. does not qualify as a "fresh complaint." Although the trial court admitted K.B.'s testimony as a "fresh complaint," ultimately that determination was irrelevant. C.R.'s statements were properly admitted without reservation under the tender years exception to the hearsay rule. There simply is no error here.

III.

A.
R.B. claims that, even though he failed to object contemporaneously to the charge actually provided by the trial court, the trial court's failure to give a verbatim recitation of the Model Jury Charge concerning the Child Sexual Abuse Accommodation Syndrome ("CSAAS") nonetheless constitutes reversible error.
A claim of deficiency in a jury charge to which no objection is interposed
will not be considered unless it qualifies as plain error, that is, legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.
[State v. Hock, 54 N.J. 526, 538, 257 A.2d 699 (1969), cert. denied, 399 U.S. 930, 90 S.Ct. 2254, 26 L.Ed.2d 797 (1970).]
The burden R.B. must meet to challenge the CSAAS charge as given is considerable and, ultimately, insurmountable.
It is instructive to first consider the purpose of CSAAS testimony and, hence, the limitations thereon; that analysis then *520 informs whether the CSAAS charge given here was proper.
State v. J.Q., 130 N.J. 554, 566-74, 617 A.2d 1196 (1993), sets forth the limitations of CSAAS expert testimony. Detailing the five traits that characterize the Child Sexual Abuse Accommodation Syndrome  "secrecy, helplessness, entrapment and accommodation, delayed disclosure, and retraction," id. at 574-75, 617 A.2d 1196  State v. J.Q. makes clear that, while an expert may explain CSAAS and its characteristics, the testimony must be carefully circumscribed to explaining to the jury that secrecy or delay in reporting sexual abuse may be typical post-sexual abuse behavior and bears no meaningful correlation to the fact of sexual abuse itself. Id. at 579, 617 A.2d 1196. Thus, expert testimony concerning the syndrome is permitted on a circumscribed basis to explain what may well be counter-intuitive to a jury: that a child victim of sexual assault is often loathe to press an accusation. Id. at 568-71, 617 A.2d 1196. Testimony concerning this syndrome is not admissible as substantive proof of child abuse. Id. at 564, 617 A.2d 1196. Because "[t]he expert should not be asked to give an opinion about whether a particular child was abused[,] ... care should be taken to avoid giving the jury an impression that the expert believes based on CSAAS ... that a particular child has been abused." State v. Michaels, 264 N.J.Super. 579, 599, 625 A.2d 489 (App. Div.1993), aff'd 136 N.J. 299, 642 A.2d 1372 (1994) (citing State v. J.Q., supra, 130 N.J. at 579-80, 617 A.2d 1196).
More recently, in State v. P.H., 178 N.J. 378, 395-96, 840 A.2d 808 (2004) (citations omitted), we summarized the purpose of CSAAS expert testimony as follows:
CSAAS expert testimony may serve a "useful forensic function" when used in a rehabilitative manner to explain why many sexually abused children delay in reporting their abuse, or later recant allegations of abuse. That is, it helps to dispel preconceived, but not necessarily valid, conceptions jurors may have concerning the likelihood of the child's truthfulness as a result of her delay in having disclosed the abuse or sought help.... CSAAS expert testimony should be admissible to assist a jury in evaluating evidence about an alleged victim's post-assault conduct or behaviors when that conduct may be misperceived by jurors as inconsistent with the truthfulness of the claim of assault. Such testimony properly can be used to explain why a victim's reactions, as demonstrated by the evidence, are not inconsistent with having been molested. However, when CSAAS evidence is admitted, the jury must receive a specific instruction that such testimony does not answer the ultimate question whether the victim's molestation claims are true.
Standing alone, R.B. does not quarrel with the admissibility of the CSAAS testimony adduced by the prosecution. Instead, R.B. advances the limited claim that the trial court's failure to use the verbatim language of the Model Jury Charge deprived him of a fair trial. Again, because R.B. did not object to the charge when given, we review the trial court's CSAAS jury charge for plain error to determine whether "the error was of such a nature as to have been clearly capable of producing an unjust result." State v. Spruell, 121 N.J. 32, 42, 577 A.2d 821 (1990). When we view the CSAAS charge given in this case through the plain error prism, we find the charge to be sufficient.
After properly instructing the jury on the limitations of expert testimony in general, the trial court instructed the jury as follows concerning the applicability of the *521 Child Sexual Abuse Accommodation Syndrome:
Now, as I indicated, Dr. Taska was called by the State to offer testimony relating to the child's sexual abuse accommodation syndrome. Such evidence is admissible for a limited purpose. It may not be considered by you as establishing that the child was a victim of sexual abuse or that the defendant committed an act of sexual abuse on the child.

Rather, this evidence is admitted to address certain pre-conceived, but not necessarily valid ideas jurors may have regarding the consistency of the conduct of a victim following an alleged assault with the fact of an actual act of abuse.

It is admissible to shield the child from the inference that he's not telling the truth, which otherwise might arise in your mind by reason of his failure to have promptly disclosed that fact that he had been abused, or his failure to have promptly sought help from a responsible adult.
If the behavior of the victim following the alleged assault raises no question in your mind as to his credibility, then the evidence regarding the child's sexual abuse accommodation syndrome should not be utilized for any purpose in your deliberation.
On the other hand, should the behavior of the victim following the alleged assault raise questions in your mind regarding his truthfulness regarding the alleged assault, then you may consider evidence of child sexual abuse accommodation syndrome as bearing on that issue alone.

Let me give you an example to illustrate the proper use of such evidence. Let's suppose at the trial there was sexual assault upon a child, the facts disclose that the child victim did not tell her mother about the assault for several days. At trial, if the defense attorney highlights for the jury the gap in time between the alleged assault and the child's first complaint seeking to have the jury infer that a normal truthful child would report such an offense immediately, and, therefore, this victim's delay in reporting the offense indicates that she's not being truthful.
If a delay in reporting the offense would not in your mind affect a child victim's credibility, then you would make no use whatsoever of the evidence related to the child abuse accom  sexual abuse accommodation syndrome.
On the other hand, if the delayed reporting by the child victim cause you concern regarding his or her truthfulness, then you might consider the evidence and give such weight to it as you deem appropriate, as it affects your determination of the child victim's truthfulness.
[emphasis supplied.]
It cannot seriously be disputed that this charge fairly and properly instructed the jury on the limited nature of CSAAS proofs: that the evidence is tendered solely to rebut the natural tendency to question the credibility of a child witness who has been a victim of sexual abuse due to a delay in reporting. State v. P.H., supra, 178 N.J. at 395-96, 840 A.2d 808.
Distilled to its essence, R.B.'s challenge to the CSAAS charge, and the position advanced by the dissent, is far too mechanistic. If our task were limited to the simple tally of references in a charge, R.B.'s claim might have some validity. Our scope of review, however, is not an exercise in arithmetic. Rather, our task is to review the charge as a whole:
In passing upon the propriety of a trial court's instruction, this court will *522 examine the entire charge to see whether the jury was misinformed as to the controlling law. It is ordinarily impossible for the trial court to state all of the applicable law in one sentence. The test, therefore, is whether the charge in its entirety was ambiguous or misleading.
[State v. Hipplewith, 33 N.J. 300, 317, 164 A.2d 481 (1960).]
When viewed as a whole, the trial court's charge on the limited nature of CSAAS testimony did not misinform the jury as to the controlling law and was neither ambiguous nor misleading. Rather, it clearly instructed the jury on the limited nature of CSAAS expert testimony, that is, that the CSAAS expert testimony was tendered solely to address whether C.R. was truthful in light of the child's delay in reporting the sexual abuse by his stepfather. The trial court's CSAAS charge as a whole was proper, a conclusion further underscored by R.B.'s failure to contemporaneously object to it at trial.
We would be remiss, however, if we failed to remind our trial courts that, insofar as consistent with and modified to meet the facts adduced at trial, model jury charges should be followed and read in their entirety to the jury. The process by which model jury charges are adopted in this State is comprehensive and thorough; our model jury charges are reviewed and refined by experienced jurists and lawyers. We find, however, that the jury charge given here, although somewhat different from the model charge, communicated clearly the purpose and limitations of CSAAS evidence and was sufficient under the circumstances.

B.
R.B. next complains that the cumulative use of his six-year-old stepson's "fresh complaint" together with the expert testimony concerning the Child Sexual Abuse Accommodation Syndrome was improper. Because we have already considered and rejected R.B.'s "fresh complaint" objection, supra, 183 N.J. at 321-22, 873 A.2d at 519, we focus instead on R.B.'s claim that the CSAAS expert testimony was unnecessary because R.B. did not attack C.R.'s credibility on the basis of a delay in reporting the sexual abuse. Once again, R.B. failed to raise this issue below and, hence, his claims must be reviewed under the plain error standard. For two separate reasons, we reject them.
R.B.'s claim that the expert CSAAS testimony simply served to bolster the testimony concerning C.R.'s "fresh complaint" cannot be sustained. Essentially, R.B. argues that because C.R.'s "fresh complaint" included testimony by C.R.'s mother about C.R.'s behavior, that is, the torturing of animals and the setting of fires, admission of expert CSAAS testimony that fleetingly described such behavior among the range of behaviors consistent with the syndrome was impermissible bolstering.
"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise." N.J.R.E. 702.
The primary justification for permitting expert testimony is that the average juror is relatively helpless in dealing with a subject that is not a matter of common knowledge. Thus, the proponent of expert testimony must demonstrate that [the] testimony would enhance the knowledge and understanding of lay jurors with respect to other testimony of a special nature normally outside the usual lay sphere.

*523 [State v. Kelly, 97 N.J. 178, 209, 478 A.2d 364 (1984) (internal citations and quotations omitted).]
When considering the credibility concerns that arise in the context of child sexual abuse cases, particularly the complicating factors that only the child bears witness to the abuse and that such claims are often made against the backdrop of a soured and antagonistic relationship between the parents of that child, we have held that
the testimony of an expert is allowed when it relates to a subject-matter beyond the understanding of persons of ordinary experience, intelligence, and knowledge. E.g., State v. Kelly, [97 N.J. 178, 478 A.2d 364 (1984)]; Evers v. Dollinger, 95 N.J. 399, 471 A.2d 405 (1984). This applies as well to the field of child sex-abuse offenses. As we have seen, such testimony may be allowed to explain generally the behavior, feelings, and attitudes of such victims when it is shown that their condition is not readily understood by persons of average intelligence and ordinary experience; an expert or scientific explanation of their condition, one accepted as reliable by the scientific community that is involved in the diagnosis, treatment, and care of such individuals can assist the jury in understanding the evidence. E.g. State v. Myers, [359 N.W.2d 604 (Minn.1984) (concerning the admissibility of CSAAS testimony in an incest prosecution)]. Further, expert testimony will be allowed to describe and explain the significance of the specific conduct of the individual victim, if it has been shown that the victim suffers from some abnormality or has been exposed to some unusual condition, in addition to the alleged offense inflicted, that would not be readily perceived or recognized as such by an average person of ordinary experience. E.g., State v. Roberts [139 Ariz. 117, 122, 677 P.2d 280, 285 (App.1983) (allowing the defendant to offer proof through a psychologist as to a nine-year-old mildly retarded girl's "organically based learning disability and an unusual preoccupation with fantasies of hostility and violence, including ideas that men and women hurt each other" when the psychologist previously examined the child and concluded she was incompetent to testify)]; see State v. Kelly, supra, 97 N.J. 178, 478 A.2d 364 [concerning the use of battered woman syndrome evidence]. These conditions for the receipt of expert testimony serve to elucidate the quest for truth in a criminal trial. Failure to adhere to these guidelines as a predicate for the admissibility of expert evidence will more likely confuse than clarify the truth that is the object of a criminal prosecution.
[State v. R.W., 104 N.J. 14, 30-31, 514 A.2d 1287 (1986) (emphasis and parenthetical explanations supplied).]
In a proper CSAAS case, "[t]he expert [is] not [ ] asked to give an opinion about whether a particular child was abused." State v. Michaels, supra, 264 N.J.Super. at 599, 625 A.2d 489. For that reason, the CSAAS expert should not describe the attributes exhibited as part of that syndrome due to the risk that the jury may track the attributes of the syndrome to the particular child in the case. Here, the CSAAS expert made reference to two elements of behavior that are among the attributes exhibited by those whose delay in reporting behavior may be explained by the Child Sexual Abuse Accommodation Syndrome. However, this reference was fleeting, was made without connecting those elements to C.R, and was made in the context of substantial other evidence of guilt.
*524 In a fundamental respect, this case comes perilously close to the setting we condemned in State v. J.Q., 130 N.J. 554, 617 A.2d 1196 (1993), where the child victims testified as to their failure to report the alleged abuse and the CSAAS expert testified not only to "the various aspects of CSAAS" but also "related them to the behavior she had observed in [the child victims]." Id. at 559, 617 A.2d 1196. In State v. J.Q., "[a]t the conclusion of her direct testimony, [the CSAAS expert] stated that, in her expert opinion, [the child victims] had been sexually abused." Ibid. The vice identified in State v. J.Q. was the expert's ultimate conclusion:
The final question to the witness was: "Doctor, based on your examination of the girls can you give this jury your expert opinion as to whether or not both [Connie] and [Norma] were sexually abused?" Answer: "I believe that they were sexually abused."
[Id. at 578, 617 A.2d 1196.]
As we further explained:
The CSAAS evidence would have served well to counter the mythology that if the abuse had occurred, the children surely would have complained sooner and would not have put up with repeated visits to the [defendant's] apartment in Brooklyn. However, when the expert, without a reliable foundation, went on to offer opinions with respect to the basic factual issues, including truth-telling, she transgressed the purpose for which CSAAS testimony is admissible.
[Id. at 582, 617 A.2d 1196.]
Unlike the expert in State v. J.Q., the CSAAS expert here never attempted either to "connect the dots" between C.R.'s behavior and the Child Sexual Abuse Accommodation Syndrome or tender an opinion as to whether C.R. in fact was abused. Therefore, because the CSAAS expert's fleeting reference to syndrome-like behaviors did not causally link C.R.'s behavior with one or more of the elements the CSAAS expert would look for in determining the applicability of the Child Sexual Abuse Accommodation Syndrome, and because other, strong evidence of guilt was presented by the prosecution, the CSAAS expert's list of some behaviors that coincide with some of the behaviors exhibited by C.R. and separately testified to by C.R.'s mother is harmless error as it is not "clearly capable of producing an unjust result." R. 2:10-2.
That said, State v. J.Q. reminds us that this is clearly hazardous ground. The jury's function to make credibility determinations cannot be usurped by expert testimony. It is, therefore, incumbent on all trial courts to insure that either CSAAS expert testimony or a CSAAS charge is provided for its carefully circumscribed and limited purpose  to "help[] explain why many sexually abused children delay reporting their abuse and why many children recant allegations of abuse and deny that anything occurred", John E.B. Myers et al., Expert Testimony in Child Sexual Abuse Litigation, 68 Neb. L.Rev. 1, 68 (1989) (as quoted in State v. J.Q., supra, 130 N.J. at 579, 617 A.2d 1196)  and does not infringe on the jury's exclusive prerogative. We again reinforce the overarching principle that CSAAS expert testimony cannot be allowed as substantive proof to establish guilt or innocence. State v. J.Q., supra, 130 N.J. at 579, 617 A.2d 1196. In the future, prosecutors and trial courts must insure that the scope of a CSAAS expert's testimony is carefully circumscribed and does not exceed its proper bounds: solely to explain to the jury why it is not uncommon for sexually abused children, without reference to the child victim in that case, to delay reporting their abuse and why many children, again without reference to the child victim in that *525 case, recant allegations of abuse and deny the events at issue.
R.B. also ignores that the crux of his defense was that C.R. was simply unworthy of belief. The unavoidable by-product of that defense was to call C.R.'s credibility directly into issue. Having raised that issue, to the virtual exclusion of any other defense save for a single witness character defense, R.B. cannot now be heard to complain of efforts designed to fairly meet his defense, at least to the extent of R.B.'s reliance on C.R.'s delay in reporting the abuse.

IV.
R.B. also claims that the prosecutor committed misconduct in three separate instances during summation. First, R.B. argues that the prosecutor improperly commented that the victim "was such a good liar, he came up with such a good lie that the police referred the case to the SAVA Department." However, a contemporaneous objection to that comment was made by R.B.'s counsel and the trial court both sustained the objection and immediately issued a curative instruction to the effect that there was "no determination of credibility involved in the referral process." We find that the prosecutor's comment was fairly invited by the defense's statements in summation that C.R. was, in any case, a manipulative liar who manufactured claims of sexual abuse to escape the consequences of his own bad behavior. Any concern that such comment bolstered anyone's credibility was promptly and fully cured by the trial court's immediate instruction. State v. Ramseur, 106 N.J. 123, 323, 524 A.2d 188 (1987), cert. denied, 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993).
R.B. also argues that the prosecutor engaged in misconduct when he remarked in summation that "a seven year old boy who comes up with a lie, the mother and grandmother would see right through it. The SAVA Unit would see right through it." Again, R.B.'s counsel objected and, this time, the trial court overruled the objection. Although the argument was improper, we find that, in those circumstances, it was harmless error.
We begin with the understanding that, while a prosecutor's summation is not without bounds, "[s]o long as he stays within the evidence and the legitimate inferences therefrom the Prosecutor is entitled to wide latitude in his summation." State v. Mayberry, 52 N.J. 413, 437, 245 A.2d 481 (1968), cert. denied, 393 U.S. 1043, 89 S.Ct. 673, 21 L.Ed.2d 593 (1969). "A prosecutor may comment on the facts shown by or reasonably to be inferred from the evidence. There is no error so long as he confines himself in that fashion. Ultimately it was for the jury to decide whether to draw the inferences the prosecutor urged." State v. Carter, 91 N.J. 86, 125, 449 A.2d 1280 (1982) (citations omitted). Further, our standard of review dictates that "[a]ny error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result...." R. 2:10-2. The harmless error standard thus requires that there be "some degree of possibility that [the error] led to an unjust result. The possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached." State v. Bankston, 63 N.J. 263, 273, 307 A.2d 65 (1973) (citing State v. Macon, 57 N.J. 325, 335-36, 273 A.2d 1 (1971)).
When measured against this yardstick, we conclude that the prosecutor's comments did not "raise a reasonable doubt as *526 to whether the error led the jury to a result it otherwise might not have reached." State v. Bankston, supra, 63 N.J. at 273, 307 A.2d 65. The evidence against R.B. was substantial and consistent; even R.B. conceded to the police that he might have engaged in inappropriate sexual contact with C.R., although R.B. claimed an inability to remember clearly because he said he suffered from "blackouts." In this context, we do not find that the prosecutor's comments could have "led the jury to a result it otherwise might not have reached." Ibid.
R.B.'s last complaint concerning the prosecutor's summation arises from the prosecutor's defense of Detective Hadfield in response to defense counsel's suggestion, also in summation, that Detective Hadfield was somehow complicit in manufacturing C.R.'s recorded statement. Although no such claim was made during Detective Hadfield's cross-examination, the defense in summation argued that the police interviewed C.R. for one hour and fifteen minutes before a fifteen minute recorded statement was taken and suggested something unseemly in that passage of time. Specifically, the defense argued that "there is an hour and [fifteen] minute period that Detective Hadfield said was just going over the pedigree. You have your own conclusions to draw." By way of response, the prosecutor argued that
Detective Hadfield has no reason to lie. Defense even brought it up, he was only assigned to that unit for two months. He's not going to, two months into the job, fabricate a partial confession from somebody. I guess the implication is he's going to score points by falsely accusing somebody 
Defense counsel objected and the trial court sustained the objection and instructed the jury to "disregard counsel's last remark." R.B. sought no further curative instruction.
Although we have not squarely ruled on this issue,[4] we agree with our Appellate Division in holding that it is improper for a prosecutor to contend in summation that the police had no motive to lie. See, e.g., State v. Goode, 278 N.J.Super. 85, 90, 650 A.2d 393 (App.Div.1994) ("[I]t has also been held improper to contend police had no motive to lie."); State v. Staples, 263 N.J.Super. 602, 606, 623 A.2d 791 (App.Div.1993) ("Moreover, it is `obviously improper' to imply that police testimony should be accepted, `not because of its believability but because the witnesses were policemen.'" (quoting State v. Jones, 104 N.J.Super. 57, 65, 248 A.2d 554 (App. Div.1968)), certif. denied, 53 N.J. 354, 250 A.2d 755 (1969)). We come to that conclusion because prosecutors must be ever mindful of the instructions earlier handed down by this Court:
We are well aware that within the legal profession the prosecutor's double calling  to represent vigorously the state's interest in law enforcement and at the same time help assure that the accused is treated fairly and that justice is done  is uniquely challenging. That challenge is what makes the prosecutor's mission such a difficult one and such an *527 honorable one. A prosecutor willing to engage in proscribed conduct to obtain a conviction ... betrays his oath in both its respects. Not only does he scoff at rather than seek justice, he also represents the state poorly.
[State v. Ramseur, 106 N.J. 123, 323-24, 524 A.2d 188 (1987), cert. denied, 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993).]
It is with the unique role of the prosecutor in mind that we review claims of prosecutorial misconduct:
Prosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented. Indeed, prosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries.....
Nevertheless, the primary duty of a prosecutor is not to obtain convictions, but to see that justice is done. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
Thus, this Court has held that prosecutorial misconduct can be a ground for reversal where the prosecutor's misconduct was so egregious that it deprived the defendant of a fair trial. In determining whether a prosecutor's misconduct was sufficiently egregious, an appellate court must take into account the tenor of the trial and degree of responsiveness of both counsel and the court to improprieties when they occurred. Specifically, an appellate court must consider (1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them. Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial. The failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made. The failure to object also deprives the court of an opportunity to take curative action.
[State v. Frost, 158 N.J. 76, 82-84, 727 A.2d 1 (1999) (internal quotations and citations omitted).]
The prosecutor in this case should not have stretched his advocacy to the use of sarcasm in defense of the credibility of Detective Hadfield. Yet, his comments did not constitute reversible error. Defense counsel timely objected and the trial court both sustained the objection and instructed the jury to disregard the comments; defense counsel sought no further curative instructions. In those circumstances, we are not persuaded that the prosecutor's attempt to bolster Detective Hadfield's testimony "substantially prejudice[d] the defendant's fundamental right to have a jury fairly evaluate the merits of his defense." State v. Bucanis, 26 N.J. 45, 56, 138 A.2d 739, cert. denied, 357 U.S. 910, 78 S.Ct. 1157, 2 L.Ed.2d 1160 (1958).[5]

*528 V.
Trials, particularly criminal trials, are not tidy things. The proper and rational standard is not perfection; as devised and administered by imperfect humans, no trial can ever be entirely free of even the smallest defect. Our goal, nonetheless, must always be fairness. "A defendant is entitled to a fair trial but not a perfect one." Lutwak v. United States, 344 U.S. 604, 619, 73 S.Ct. 481, 97 L.Ed. 593 (1953); accord, State v. Marshall, 123 N.J. 1, 169-70, 586 A.2d 85 (1991), cert. denied, 507 U.S. 929, 113 S.Ct. 1306, 122 L.Ed.2d 694 (1993). We are satisfied that, on the whole, R.B.'s trial and conviction were fair.
We therefore affirm the judgment of the Appellate Division.
Justice ALBIN, dissenting.
The State's case, essentially, rested on the credibility of one witness, the alleged child-sex-abuse victim, C.R., who was nine years old at the time of trial. In his summation, the prosecutor pursued a line of argument to bolster the child's testimony that was unsupported by the evidence and clearly impermissible. Without any factual basis and in violation of the cardinal principle that one witness cannot vouch for the truth of another witness's testimony, the prosecutor asked the jury to convict defendant because C.R.'s mother, grandmother, and the Hudson County Prosecutor's Sexual Assault Victim's Assistance Unit (SAVA) believed C.R.'s account of how he was victimized by defendant. The prosecutor's highly prejudicial comments were made to the jury over the objection of defense counsel. I cannot agree with the majority that those improper prosecutorial remarks were harmless simply because trials by their nature are imperfect. Those remarks, along with others, poisoned defendant's ability to receive a fair trial, particularly when combined with the court's inappropriate charge on the use of Child Sexual Assault Accommodation Syndrome (CSAAS) testimony. Because I believe that this Court should grant defendant a new trial, I respectfully dissent.

I.
Defendant's first trial ended in a hung jury. In the second trial, the jury learned that when C.R. was six years old, he was engaged in a pattern of depraved and destructive behavior, which included torturing the family cats, setting a fire in the house, defecating in the cats' litter box, and punching his three-year-old sister. In response to this alarming conduct, C.R.'s mother asked him whether anyone had touched him inappropriately. After denying that anyone had improperly touched him, C.R. alleged that his biological father had done so. He then retracted that statement and implicated defendant, his stepfather. In a later interview with detectives from the Hudson County Prosecutor's Office, C.R. claimed that defendant had sexually abused him.
In the absence of physical evidence, the prosecution's case rested entirely on the credibility of C.R., whose trial testimony was buttressed by his prior out-of-court statements to his mother and detectives from the SAVA Unit. No witness, however, testified that C.R.'s account was truthful. In summation, defense counsel attempted to portray C.R. as untrustworthy, and asked the jury to reject his testimony. Against that backdrop, the prosecutor offered these remarks in summation:
PROSECUTOR: If he [C.R.] was lying several problems exist. If he was *529 lying, first of all, he wouldn't be able to lie to that many people....
He convinces his mother. She even testified she cried, although she says now that she doesn't believe him, yet she cried when  when he told her this. He was such a good liar he convinced the grandmother to such a degree that she called the police.

He was such a good liar, he came up with such a good lie that the police referred the case to the SAVA Department.
DEFENSE COUNSEL: Objection, Judge. I think that's an unfair comment that they made a judgment as to his credibility before they transferred it to the Prosecutor's Office. That's the import of that statement.
THE COURT: Objection sustained, sir. There's no determination of credibility involved in the referral process. [(Emphasis added).]
At the very least, the trial court understood that a referral of the case by the police to the sexual abuse unit of the Prosecutor's Office was not evidence of defendant's guilt. The court, however, did not correct in strong, categorical language the prosecutor's prejudicial and seductive supposition that the jury should credit C.R.'s testimony because others accepted his account as true. The court did not correct the prosecutor's suggestion that the call to the police by the grandmother  who did not even testify  was a clear indication that she believed C.R. The prosecutor's argument that the grandmother and police believed C.R.'s description of events led to one irresistible conclusion  that they also believed defendant was guilty. The prosecutor kept hammering on this point.
PROSECUTOR: The Defense's theory that [C.R.'s] making this up doesn't make sense. It wouldn't carry itself all the way through. Not only would he not lie to all these people, he wouldn't be able to lie successfully to all these people.
A seven year old boy who comes up with a lie, the mother and the grandmother would see right through it. The SAVA Unit would see right through it.
DEFENSE COUNSEL: Objection, Judge.
COURT: Overruled  submission.
PROSECUTOR: A seasoned defense attorney would be able to bring it out that he was lying. The Defense would have you believe that this seven year old boy from the time he's seven to nine is such a sophisticated liar that he's able to maintain his lie throughout this entire process without being called on it.
[(Emphasis added).]
The court should have forcefully sustained defense counsel's objection for several reasons. First, the prosecutor's remarks were not supported by the record and cannot be considered fair comment. There was no testimony that C.R.'s mother, his grandmother, or the SAVA Unit had endorsed the truthfulness of C.R.'s account. By claiming that they did, the prosecutor, in essence, offered testimony bolstering C.R.'s credibility. Second, that portion of the prosecutor's argument was remarkably similar to his earlier remarks disapproved of by the trial court. Nevertheless, over defense counsel's objection, the prosecutor was permitted to present a seemingly neat, logical argument in which C.R.'s mother, grandmother, and the SAVA Unit were transformed into infallible lie detectors. The prosecutor's argument suggested that C.R. was incapable of pulling the wool over the eyes of his mother, grandmother, and the SAVA Unit and, therefore, C.R. must be truthful and defendant must be guilty. Moreover, the jury likely could not have distinguished *530 between the earlier disallowed remarks and the later permitted remarks that carried the exact same message. Under those circumstances, both sets of prosecutorial remarks possessed the very real potential to prejudice the jury's determination of C.R.'s credibility.
A prosecutor may neither personally vouch for a witness nor refer to evidence beyond the record to support a witness's credibility. State v. Walden, 370 N.J.Super. 549, 560, 851 A.2d 758 (App.Div.), certif. denied, 182 N.J. 148, 862 A.2d 56 (2004). We do not allow one witness to vouch for the testimonial account of another witness because the ultimate determination of a witness's credibility falls within the exclusive domain of the jury. See, e.g., State v. Frisby, 174 N.J. 583, 593-94, 811 A.2d 414 (2002); see also State v. Smith, 167 N.J. 158, 184-85, 770 A.2d 255 (2001) (holding that implicitly endorsing credibility of State's witness is improper).
In Frisby, supra, the defendant was convicted of second-degree endangering the welfare of a child in connection with the death of her infant son. 174 N.J. at 587, 811 A.2d 414. The case was a "pitched credibility battle" between the defendant and the child's father over who was responsible for the care of the child at the time of his death. Id. at 596, 811 A.2d 414. At defendant's trial, two law enforcement officers testified that they had "`substantiated'" the father's account and his whereabouts by speaking with witnesses. Id. at 591, 811 A.2d 414. One officer stated that there was "`not enough information for us to charge [the father] with anything.'" Id. at 592, 811 A.2d 414. The other testified that the father "was not charged because the police `didn't feel that there was enough evidence, that he was more credible than [the defendant] at that point.'" Ibid.
We reversed the defendant's conviction because, "[b]ased on the hearsay evidence, the police essentially gave the jury their opinion regarding the innocence of [the father] and inferentially the guilt of [the defendant]." Id. at 593-94, 811 A.2d 414. In Frisby, supra, we held that "`[t]here is no provision in our legal system for a "truth-teller" who is authorized to advise the jury on the basis of ex parte investigations what the facts are and that the defendant's story is a lie.'" Id. at 595, 811 A.2d 414 (quoting State v. Pasterick, 285 N.J.Super. 607, 620, 667 A.2d 1103 (App. Div.1995)). We noted that "`the question of a witness' credibility has routinely been regarded as a decision reserved exclusively for the jury'" and that "`ordinarily jurors require no expert assistance'" on the subject. Id. at 594, 595, 811 A.2d 414 (quoting State v. J.Q., 252 N.J.Super. 11, 39, 599 A.2d 172 (App.Div. 1991), aff'd, 130 N.J. 554, 556, 617 A.2d 1196 (1993)). We concluded that "[a]ny improper influence on the jury that could have tipped the credibility scale was necessarily harmful and warrant[ed] reversal." Id. at 596, 617 A.2d 1196.
I cannot find any principled distinction between Frisby, supra, and this case. In Frisby, supra, two witnesses in their testimony improperly vouched for the credibility of another witness. Here, the prosecutor gave the functional equivalent of testimony when he improperly vouched for the credibility of C.R. Without any evidential support, the prosecutor was permitted to argue that C.R.'s family members and the police had endorsed the truthfulness of C.R.'s account. Moreover, the jury may have been inclined to give undue weight to the suggestion that the SAVA Unit  a law enforcement unit specializing in the handling of sexual abuse cases  believed C.R. Arguably, the prejudice was exponentially greater in this case because the prosecutor had the last *531 word in summation, defense counsel had no opportunity to respond, and the court gave its imprimatur to the prosecutor's remarks. In both cases, improper bolstering diluted the jury's ultimate and exclusive responsibility to determine the credibility of the witnesses. In this case, the prosecutor's testimonial remarks exceeded the bounds of fair comment and had the clear potential to tip the credibility scales in the jurors' minds. This Court has held that the appropriate remedy in such circumstances is reversal and a new trial. Ibid.
Moreover, I agree with the majority that the prosecutor violated the oft-repeated admonition that it is improper to argue in summation that a police officer should be believed because he has no motive to lie due to the office he holds. I disagree with the majority that we have not squarely ruled on this issue. In State v. Frost, we characterized as "egregious" the prosecutor's summation remark "that the police officers would not lie because of the `magnitude' of charges that could be brought against them." 158 N.J. 76, 85, 727 A.2d 1 (1999). That remark was part of a mosaic of cumulative error that resulted in the reversal of the defendants' convictions. Id. at 88-89, 727 A.2d 1. We further noted in Frost, supra, that
[o]ur courts have consistently held that such statements by a prosecutor about a police officer's credibility are wholly inappropriate. See, e.g., State v. Goode, 278 N.J.Super. 85, 90, 650 A.2d 393 (App.Div.1994) (recognizing that it was improper for prosecutor to tell jury that police had no motive to lie); [State v.] Staples, [ ] 263 N.J.Super. [602,] 604-06, 623 A.2d 791 [(App.Div.1993)] (recognizing impropriety of prosecutor asking officer "is your career and the penalties that you would sustain for perjuring yourself worth the conviction for a $20.00 bag of cocaine?" during direct examination); [State v.] Engel, [] 249 N.J.Super. [336,] 379, 592 A.2d 572 [(App.Div.), certif. denied, 130 N.J. 393, 614 A.2d 616 (1991)] (recognizing that it was improper for prosecutor to tell jury that investigators were "good men who leave their family [and] work day and night" and would not "jeopardize their careers" over defendants); State v. West, 145 N.J.Super. 226, 233-34, 367 A.2d 453, (App.Div.1976), certif. denied, 73 N.J. 67, 372 A.2d 332 (1977) (finding improper prosecutor's statements that police officer would not lie because "[t]here is a lot of harm that could come to him" and because "the police officer's career would be finished in a minute"); State v. Jones, 104 N.J.Super. 57, 65, 248 A.2d 554 (App.Div.1968), certif. denied, 53 N.J. 354, 250 A.2d 755 (1969) (stating that it is "obviously improper" to imply that police testimony should be accepted, "not because of its believability but because the witnesses were policemen").
[Id. at 85-86, 727 A.2d 1.]
In this case, the prosecutor stated that "Detective Hadfield has no reason to lie.... [H]e was only assigned to that unit for two months. He's not going to, two months into the job, fabricate a partial confession from somebody."[6] Those remarks had the additional vice of suggesting that the prosecutor personally vouched for the credibility of the detective. "A prosecutor may not express a personal belief or opinion as to the truthfulness of his or her witness's testimony." Staples, supra, 263 N.J.Super. at 605, 623 A.2d 791 (citing State v. Marshall, 123 N.J. 1, 154, 156, 586 A.2d 85 (1991), cert. denied, 507 *532 U.S. 929, 113 S.Ct. 1306, 122 L.Ed.2d 694 (1993)).
The alleged victim's credibility, which was hotly contested, was the cornerstone of the State's case. I believe that the cumulative effect of the prosecutor's summation remarks denied defendant his right to a fair trial.

II.
In approving the use of expert testimony to explain Child Sexual Abuse Accommodation Syndrome, this Court recognized the real potential that a jury might consider such evidence for an improper purpose. State v. J.Q., 130 N.J. 554, 578, 617 A.2d 1196 (1993). Accordingly, we stressed that when the jury receives expert CSAAS testimony, it must "be given proper instructions limiting the evidence to the purpose for which it is offered[.]" Id. at 584, 617 A.2d 1196. CSAAS testimony is allowed in order to explain why a child who is a victim of sexual abuse might delay reporting the abuse. State v. P.H., 178 N.J. 378, 395, 840 A.2d 808 (2004). CSAAS evidence is not admissible as substantive proof that child sexual abuse actually occurred. State v. W.L., 278 N.J.Super. 295, 301-02, 650 A.2d 1035 (App.Div.1995); see generally J.Q., supra, 130 N.J. at 574-84, 617 A.2d 1196. Therefore, "when CSAAS evidence is admitted, the jury must receive a specific instruction that such testimony does not answer the ultimate question whether the victim's molestation claims are true." P.H., supra, 178 N.J. at 396, 840 A.2d 808.
The importance of a correct CSAAS charge in this case should not be underestimated. Our caselaw does not permit CSAAS testimony to be used as substantive evidence against a defendant. P.H., supra, 178 N.J. at 396, 840 A.2d 808; W.L., supra, 278 N.J.Super. at 301-02, 650 A.2d 1035. The same day that the case went to the jury, the State's CSAAS expert testified that fire-starting and hurting animals are part of a pattern of behavior typical in sexually abused children. With that testimony fresh in their minds, the jurors could not have failed to make the prohibited connection to C.R.'s mother's testimony concerning her son's setting fire to a rug and torturing cats. The jury was able to put two and two together: a child who sets fires and tortures animals must have been abused.
However "fleeting" the expert's testimony on the forbidden subject, the impact was nonetheless devastating to the defense. An earthquake can be fleeting  a matter of seconds  but the destruction it leaves in its wake is lasting. The harm caused by the expert is not measured by the time she dwelled on the highly inflammatory matter, but by the probable effect it had on the jury.
The perfect coincidence between the expert's testimony and C.R.'s mother's testimony required that the trial court warn the jury explicitly that it could not consider the CSAAS testimony as evidence that abuse had occurred. The trial court, however, did not give the necessary warning to counteract the clear prejudice to defendant. The trial court opted not to read the Model Jury Charge on the proper use of CSAAS testimony and instead crafted its own charge gutting many of the protections in the model instructions.
The model CSAAS jury instruction gives multiple warnings about the permissible and forbidden uses of CSAAS evidence with the goal of reinforcing the limited nature of such evidence. The Model Jury Charge provides the following cautionary instructions:

You may not consider Dr. [A]'s testimony as offering proof that child sexual abuse occurred in this case. [Likewise, *533 you may not consider Dr. [B]'s testimony as proof that child sexual abuse did not occur.] The Child Sexual Abuse Accommodation Syndrome is not a diagnostic device and cannot determine whether or not abuse occurred. It relates only to a pattern of behavior of the victim which may be present in some child sexual abuse cases. You may not consider expert testimony about the Accommodation Syndrome as proving whether abuse occurred or did not occur. Similarly, you may not consider that testimony as proving, in and of itself, that ____, the alleged victim here, was or was not truthful.
Dr. [A]'s testimony may be considered as explaining certain behavior of the alleged victim of child sexual abuse. As I just stated, that testimony may not be considered as proof that abuse did, or did not, occur....
....

You may not consider the expert testimony as in any way proving that [defendant] committed, or did not commit, any particular act of abuse.
[Model Jury Charge (Criminal), Child Sexual Abuse Accommodation Syndrome (2001) (emphasis added).]
On the other hand, the trial court, in its own tailored charge, reduced the repeated warnings in the Model Charge to just one sentence: "[CSAAS evidence] may not be considered by you as establishing that the child was a victim of sexual abuse or that the defendant committed an act of sexual abuse on the child." I cannot agree with the majority that the failure to impress forcefully on the jury the strictly limited use of CSAAS testimony is "an exercise in arithmetic."
Moreover, the court's charge departed from the Model Charge by giving an illustration of the use of CSAAS testimony through a thinly veiled retelling of the facts of the current case.[7] In contrast, the Model Charge gives a neutral example of a property crime, rather than a sexual assault crime, to explain the import of delayed reporting in the context of CSAAS testimony, thereby avoiding any hint of partiality.[8]
Finally, the trial court's jury instructions repeatedly referred to "the victim" or "the child victim," whereas the Model Jury Charge refers to "the alleged victim." Ibid. The court's identification of C.R. as the victim in the jury charge had the obvious potential to diminish the presumption of innocence accorded to defendant. In isolation, and particularly because defense counsel raised no objection, such an error might not appear to be of great moment. However, we should not overlook the cumulative effect of the errors in this case  even plain errors.
*534 "`[C]lear and correct jury instructions are essential for a fair trial' because the jury charge `is a road map to guide the jury, and without an appropriate charge a jury can take a wrong turn in its deliberations.'" State v. Marshall, 173 N.J. 343, 359, 801 A.2d 1142 (2002) (quoting State v. Koskovich, 168 N.J. 448, 507, 776 A.2d 144 (2001)). The court's significant departure from the Model Jury Charge may well have sent the jury in the wrong direction.
I cannot conclude that the combination of errors in the prosecutor's summation and in the charge to the jury was harmless. Unlike the majority, I believe that defendant was denied his right to a fair trial and that he should receive a new trial. I, therefore, dissent.
Justices LONG and WALLACE join in this opinion.
For affirmance  Chief Justice PORTIZ and Justices LaVECCHIA, ZAZZALI, and RIVERA-SOTO  4.
For reversal  Justices LONG, ALBIN, and WALLACE  3.
NOTES
[1] In a supplemental letter brief submitted after we granted certification, R.B. claimed that (a) the trial court erred in allowing the cumulative use of the "fresh complaint" testimony and the expert testimony concerning the child sexual abuse accommodation syndrome, and (b) a remand is necessary to settle the record as to whether statements regarding an assault on another child were made available to the jury. Because of our disposition of R.B.'s separate claims concerning the "fresh complaint" testimony and the expert testimony concerning the child sexual abuse accommodation syndrome, we find no merit in this post-certification added issue; on application by the State, R.B.'s second post-certification added issue was stricken.
[2] The State did not seek certification on the elimination of a consecutive term imposed as part of R.B.'s sentence.
[3] Our present evidence rule has its genesis in former Rule 63(33), which, in turn, was proposed by this Court in State v. D.R., 109 N.J. 348, 371-77, 537 A.2d 667 (1988), where we set out the requirements for admission that were incorporated into former Rule 63 and now are part of N.J.R.E. 803(c)(27).
[4] The dissent asserts that, in State v. Frost, 158 N.J. 76, 727 A.2d 1 (1999), this Court has squarely held that it is improper for a prosecutor to contend in summation that the police had no motive to lie. We cannot give Frost the expansive reading the dissent suggests. Rather, Frost includes a prosecutor's comment in summation that the police would have too much to risk by lying as part of a much larger mosaic of cumulative error warranting reversal. Stated differently, Frost does not stand for the proposition that a prosecutor's comment in summation that the police had no motive to lie  standing alone  constitutes error. It is this latter conclusion we address today.
[5] The dissent asserts it "cannot find any principled distinction between [State v. Frisby, 174 N.J. 583, 811 A.2d 414 (2002)] and this case." post, 183 N.J. at 338, 873 A.2d at 530. We respectfully disagree. Frisby rightly condemned testimony by two separate police officers to the effect that the version of the events given by another trial witness was "substantiated" and "more credible." As Frisby unequivocally states, the admission of that testimony was plain error for three separate reasons: it was inadmissible hearsay, it was factually untrue, and it impermissibly encroached on the jury's exclusive function of weighing credibility. Id. at 595, 811 A.2d 414. In stark contrast, the prosecutorial comments complained of here were not testimonial but argument, and were considerably more limited in scope.
[6] The court sustained defense counsel's objection to those comments.
[7] The court gave the following instruction:

Let me give you an example to illustrate the proper use of such evidence. Let's suppose at the trial there was sexual assault upon a child, the facts disclose that the child victim did not tell her mother about the assault for several days. At trial, if the defense attorney highlights for the jury the gap in time between the alleged assault and the child's first complaint seeking to have the jury infer that a normal truthful child would report such an offense immediately, and, therefore, this victim's delay in reporting the offense indicates that she's not being truthful.
[8] The Model Charge provides:

To illustrate, in a burglary or theft case involving an adult property owner, if the owner did not report the crime for several years, your common sense might tell you that the delay reflected a lack of truthfulness on the part of the owner. In that case, no expert would be offered to explain the conduct of the victim, because that conduct is within the common experience and knowledge of most jurors.
[Model Jury Charge (Criminal), Child Sexual Abuse Accommodation Syndrome (2001).]