**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4519-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

CALEB L. MCGILLVARY,

    Defendant-Appellant.

_____

Submitted May 12, 2021 – Decided August 4, 2021

Before Judges Alvarez and Geiger.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 16-05-0344.

Meyerson & O'Neill, attorneys for appellant (Matthew L. Miller, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Amanda G. Schwartz, Deputy Attorney General, of counsel and on the briefs).

Appellant filed pro se supplemental briefs.

PER CURIAM

Tried by a jury, defendant Caleb McGillvary was convicted of first-degree murder, N.J.S.A. 2C:11-3(a)(1), (2). On May 30, 2019, the court sentenced defendant to fifty-seven years of imprisonment, subject to the No Early Release Act's (NERA) eighty-five percent parole ineligibility. See N.J.S.A. 2C:43-7.2. He appeals by way of counseled and uncounseled briefs, alleging that the court committed prejudicial errors during trial, and that the representation he received was ineffective. We affirm.

The charges against defendant arose from the May 13, 2013 discovery of the victim, Joseph Galfy, Jr., a seventy-four-year-old attorney. Police found Galfy beaten to death, lying face-down on his bedroom floor. Officers collected a variety of items and swabs from the scene, including a one-way train ticket from Rahway to Asbury Park from the day before, Sunday, May 12, 2013. Following that lead, Union County Prosecutor's Office Homicide Task Force Sergeant Johnny Ho located surveillance footage from the New Jersey Transit Rahway station, in which Galfy is seen that morning accompanied by another person, later identified as defendant. The video depicted Galfy purchasing a ticket from a vending machine and handing it to defendant, who then hugged the victim. The two men walked towards a train platform.

A-4519-18

Galfy's cell phone contact list included a number for "Kai" Lawrence, matching the telephone number on a piece of paper found in the bedroom. The victim and defendant exchanged calls on the evening of May 12, 2013. Galfy told defendant via text message at 5:33 p.m. that he would be at the train station in about ten minutes.

As a result, officers obtained a court order permitting the retrieval of defendant's phone and phone GPS records. However, the phone had been recently deactivated, and the final recorded location was Clark, the town where Galfy lived.

Defendant's last phone contact was with Kimberly Conley-Burns. She testified at trial that she contacted defendant on Facebook, as he was an internet personality, informing him that if he were ever in New Jersey, she could find him a place to stay. On Saturday, May 11, the day before the murder, defendant told Conley-Burns that he had met a man in Times Square who drove him to New Jersey, and was planning to stay in Newark, which defendant mistakenly believed was where the victim lived. Defendant mentioned that the person was older, his name was Joe, and that he was a lawyer.

A-4519-18

In a voicemail and text exchange, Conley-Burns warned defendant that Newark was dangerous and that he needed to be careful. He responded that he had found someone: "a good person who put [him] up for the night."

Defendant and Conley-Burns planned to meet in Asbury Park on May 12, which was Mother's Day. Because of a family brunch, Conley-Burns did not appear when defendant arrived that morning, so they changed their plan, agreeing to go to Philadelphia the following day. Defendant texted Conley-Burns that he had "to head up to Newark."

Conley-Burns then received a series of calls from defendant, which she was unable to answer. He told her that the place in Newark "fell through," asking if she could pick him up.

At approximately 10:00 to 10:15 p.m., defendant appeared at the White Diamond Diner in Clark, where he encountered Robert McNamara and his brother, initiating conversation and showing them an online video of himself. Defendant asked for directions to Rahway.

Alexander McCue was working at a 7-11 in Clark at around 11:30 p.m. when he saw defendant, whom he recognized from the internet because of defendant's distinctive face tattoo. Defendant asked McCue for directions to the Rahway train station, and McCue told him he thought there might be a train

station in Clark. Defendant interrupted him, saying he was not returning to Clark, and was looking for the quickest way out. McCue told defendant to walk across the street since that was the border of Rahway, and defendant left.

Robert Scully, a New Jersey Transit train conductor, testified that while working the night shift, traveling between Long Branch and New York City, he collected defendant's ticket, noticing it was for Asbury Park. Scully explained defendant needed to catch a connecting train at Long Branch but would have to wait since none operated at that hour. Defendant borrowed Scully's phone to ask his ride to meet him at Long Branch, although defendant had to place multiple calls, possibly because no one was answering at the other end. The train arrived in Long Branch shortly after 2:30 a.m.

The following day, Monday, May 13, defendant left another voicemail for Conley-Burns, describing his appearance so she could identify him when she arrived at the Asbury Park train station. Once they met, he immediately told her he had just been "raped." Defendant added that he had contacted police, but that they would not do anything because the assailant was an attorney. Defendant also told her that he had awakened to find that he had ejaculate in his mouth, on the side of his face, and on the side of his cheek. He said something to the

A-4519-18

perpetrator about it but Galfy denied that he did anything, so defendant just left. Defendant did not mention the rape again.

Conley-Burns saw no bruises, cuts, scratches, or scrapes on defendant's hands or face. Defendant told her he had cut his hair short, to about an inch or two, with a knife. He did not give a reason.

On the way to Philadelphia, Conley-Burns stopped to pick up a friend. She remembered defendant during that day as "very friendly," "talking to people," "rapping or beat boxing with these kids," "joking around," and "animated and playful." Defendant was "chatty. Off-beat. Quirky," and acted "weird." After spending time in Philadelphia, Conley-Burns drove defendant to the home of Marjory Erin Wagner, a friend who lived near Glassboro, because Wagner had agreed to let defendant stay there for the night.

Wagner testified that after Conley-Burns left, she, defendant, and her boyfriend spent the evening "listening to stories and drinking some beers." The following day, they drove defendant to a train station in Haddonfield around 7:00 or 8:00 in the evening. Defendant never said he had been raped, and she described his demeanor as "interesting" and "weird."

Defendant was eventually located in the Greyhound Bus terminal in Philadelphia on May 16, 2013, and taken to a precinct station. Ho and others

6

arrived at approximately 9:00 p.m. and interviewed defendant after advising him that he was being charged with murder. Defendant waived his Miranda[1] rights and gave a lengthy recorded statement, ending when he requested counsel. The video was shown to the jury.

When officers questioned defendant initially about what happened, defendant asked: "he died?" Defendant then told Ho that he met Galfy in Times Square by the bus depot, and told Galfy he was headed to New Jersey. The two got dinner from a restaurant near Galfy's house, and at first defendant "thought [Galfy] was real nice and then he [f***ing] raped me." After dinner, they drank beer while watching television in the living room, and defendant said Galfy wanted to put defendant's beer in a glass instead of leaving it in the bottle. Defendant drank about five beers and felt kind of groggy but walked to the guest bedroom by himself.

Defendant told detectives that before going to bed, Galfy asked defendant to shower with him. Defendant refused and showered alone before going to sleep. He awakened with a metallic taste in his mouth, a bad headache, and when he looked in the mirror in the morning, he thought he saw dried ejaculate on the side of his face. He did not confront Galfy and said he did not "really

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

know what to think about it." Galfy drove him to a train station and purchased him a ticket to Asbury Park.

Defendant claimed that when he returned to Galfy's that night, they had dinner and a couple of beers. Defendant awakened on Galfy's bedroom floor, only to find Galfy pulling his pants. At that point, defendant began to hit him. Defendant could not remember how he struck Galfy. He said he "could have elbowed him. . . . kneed him. I don't know." He left the house, and remembered going to a diner and catching a train to Long Branch.

At trial, defendant explained his "home-free" lifestyle in which he played music and worked construction jobs when he needed money, but otherwise spent his time surfing. Around 2012 to 2013 he traveled from his home in Canada to the United States to continue this lifestyle. In February 2013, he achieved internet fame following an incident in California. He continued across the country, being offered food and places to stay by people who knew him from the internet.

Defendant testified that he encountered Galfy in New York City, that Galfy asked where he was headed, and remarked that he looked lost. Galfy put him up for the night, and he left after breakfast. Galfy told him to call if he was in the area and needed a place to stay. Defendant thanked Galfy and hugged

A-4519-18

him goodbye because he did not know "what he had done to [him] at the time." He gave Galfy his phone number and email address.

On the stand, defendant said he cut his hair short on May 12, 2013, because he was warm. He testified he was going to travel to Atlanta, and it would be "really hot" there. Defendant cut his jeans into shorts because he wanted to exercise.

After his original plans with Conley-Burns fell through, defendant decided to spend a second night at Galfy's house. He thought he was still in the greater Newark area, which Conley-Burns had described as a dangerous place. Defendant took the train to Long Branch, hoping that if he was geographically closer to Galfy, Galfy would be more likely to let him stay at his home. After getting off the train, defendant called and asked if Galfy could host him again. Galfy agreed but added he would have to wait to be picked up since Galfy was in New York City. Defendant waited approximately forty-five minutes.

Once back at Galfy's home, Galfy again gave defendant beer poured into a glass. After dinner and a few beers, defendant "was feeling like really warm and fuzzy and like relaxed." He recalled Galfy putting the dishes in the dishwasher; the last thing he remembered was hearing the Jeopardy theme song. He came to on the floor in Galfy's room on his back.

9

Defendant testified:

> [T]he next thing I knew he was shoving me into the bed and I was trying to get him away from me and then I was hitting him and then he shoved my head on the floor and body slammed me and I couldn't breathe. And I was trying to get out from underneath him and he kept humping and grinding me. And he, he was trying to put my dick in his mouth and I was trying to get him away from me. I -- that's, that's all I can remember.

After the incident, defendant could not recall how he left Galfy's house or where he went. He knew he "came to" in a parking lot, his muscles were sore, he had a headache, and a metal taste in his mouth. Defendant remembered going to the diner and the 7-11. At the diner, he went into the bathroom, dry heaved into a toilet, and splashed water on his face. He showed a video of himself on the internet to the other men in the diner, ate something, and went outside to smoke. Defendant had problems with his phone, and by the time he was on the train to Long Branch, had thrown it out because it smelled like urine and would not turn on.

Defendant could not recall the whereabouts of the things he wore during the alleged sexual assault, which he said were soaked in blood and urine. He wore different clothes when speaking to the detectives in Philadelphia, but "[a]t some point [he] had to have [changed] because when [he] came to," he was dressed differently. He also confirmed that in a photograph taken with an

10

employee at the diner the night after the alleged sexual assault he was wearing different clothing. He claimed he was unaware that Galfy died until informed by the detectives.

Pre-trial, defendant unsuccessfully moved to suppress his initial statement, and to recuse the Union County criminal bench, or in the alternative, to be granted a change of venue. He also wanted to testify regarding Galfy's vacations outside the country, which he characterized as "kind of creepy" without further explanation, and to cross-examine a neighbor about a young man who had briefly lived with Galfy. We provide greater detail regarding those applications in the relevant sections. That motion was also denied.

Post-conviction, defense counsel filed a motion for a new trial, as did defendant pro se. Both motions were denied. Defendant unsuccessfully moved to represent himself during his sentencing.

Now on appeal, defendant claims the following errors:

POINT I

[DEFENDANT]'S CONVICTION FOR FIRST DEGREE MURDER WAS AGAINST THE WEIGHT OF THE EVIDENCE.

    A.    The Evidence Adduced at Trial Was Not Sufficient to Establish Beyond a Reasonable Doubt that [Defendant] Killed Mr. Galfy Purposely or Knowingly.

11

POINT II

[DEFENDANT] IS ENTITLED TO A NEW TRIAL BECAUSE HE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AND THERE EXISTS A REASONABLE PROBABILITY THAT THE RESULT WOULD HAVE BEEN DIFFERENT BUT FOR COUNSEL'S ERRORS.

A.   Trial Counsel's Failure to Move to Strike Inadmissible Portions of Dr. Shaikh's Testimony was a Clear and Prejudicial Error that Prevented [Defendant] From Receiving a Fair Trial.

B.   Trial Counsel's Refusal to Cross-Examine a Key Witness Prejudiced [Defendant]'s Ability to Present His Defense.

C.   Trial Counsel Contradicted [Defendant]'s Testimony in His Closing Statement.

POINT III

THE TRIAL COURT'S FAILURE TO STRIKE INADMISSIBLE AND HIGHLY PREJUDICIAL EXPERT TESTIMONY WAS A CLEAR ERROR THAT PREVENTED DEFENDANT FROM RECEIVING A FAIR TRIAL AND NECESSITATES REVERSAL ON APPEAL.

POINT IV

PROSECUTORIAL MISCONDUCT PREJUDICED [DEFENDANT]'S RIGHT TO A FAIR TRIAL.

A.   The State Misconstrued and Exaggerated the Evidence Concerning the Manner in Which

Decedent Sustained His Injuries in Direct Contravention of the Record.

B. The State Mischaracterized [Defendant]'s Defense to Make it Appear Implausible and Absurd.

C. The Prosecutor's Improper Characterization of the Evidence and Defendant's Theory of the Case Contributed to the Cumulative Errors that Rendered this Trial Unreliable and Unfair.

POINT V

THE TRIAL COURT'S APPLICATION OF AGGRAVATING FACTOR [ONE] WAS IMPROPER BECAUSE IT DOUBLE COUNTED THE EVIDENCE USED TO ESTABLISH THE OFFENSE.

A. The Trial Court Improperly Applied Aggravating Factor [One].

POINT VI

THE TRIAL COURT ERRED BY BARRING [DEFENDANT]'S TESTIMONY CONCERNING THE ALLEGED 'CREEPINESS' OF MR. GALFY'S VACATIONS AND THE 'YOUNG FRIEND' HE HAD LIVING WITH HIM.

POINT VII

CUMULATIVE ERROR PREVENTED [DEFENDANT] FROM RECEIVING A FAIR TRIAL.

In his pro se brief, defendant raises the following claims of error:

13

POINT I

DENIAL OF [DEFENDANT]'S MOTION TO CHANGE THE VENUE WAS AN ABUSE OF DISCRETION AMOUNTING TO REVERSIBLE ERROR.

POINT II

CHARGING JURY BURDEN SHIFTING [N.J.S.A.] 2C:2-8(d) INSTRUCTION OVER [DEFENDANT]'S OBJECTION DEPRIVES HIM OF HIS SUBSTANTIAL RIGHT TO DUE PROCESS AND REQUIRES REVERSAL.

POINT III

IRREGULAR INFLUENCES ON THE JURY WERE PLAIN ERROR AFFECTING [DEFENDANT]'S SUBSTANTIVE DUE PROCESS RIGHTS AND REQUIRES REVERSAL AND A NEW TRIAL.

POINT IV

TRIAL COURT'S PROHIBITION ON CALLING OR CONFRONTING WITNESSES WAS STRUCTURAL ERROR REQUIRING REVERSAL.

POINT V

THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO SUPPRESS [DEFENDANT'S] [MAY 16, 2013] STATEMENT; AND ITS ADMISSION AT TRIAL AND ALSO [DEFENDANT]'S TESTIMONY WERE FRUITS OF THE POISONOUS TREE.

POINT VI

TRIAL COURT ABUSED ITS DISCRETION BY NOT PROVIDING AN ADVERSE INFERENCE INSTRUCTION TO REMEDY [BRADY[2]] VIOLATIONS BY THE STATE, WHICH REQUIRES A NEW TRIAL.

POINT VII

DEFENSE COUNSEL['S] . . . PERFORMANCE AT TRIAL DEPRIVED [DEFENDANT] OF HIS SUBSTANTIAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, A STRUCTURAL ERROR REQUIRING REVERSAL.

POINT VIII

DENIAL OF [DEFENDANT]'S SUBSTANTIAL SIXTH AMENDMENT RIGHT TO SELF-REPRESENTATION WAS A STRUCTURAL ERROR REQUIRING REVERSAL OF [DEFENDANT]'S CONVICTION.

I.

We first address defendant's contention that the first-degree murder conviction was against the weight of the evidence. He posits that because the evidence did not demonstrate the requisite state of mind, the judge should have granted his motion for a new trial.

---

[2]  Brady v. Maryland, 373 U.S. 83 (1963).

Rule 3:20-1 provides that a trial judge may grant such applications where "required in the interest of justice." However, the trial judge shall not "set aside the verdict of the jury as against the weight of the evidence unless, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a manifest denial of justice under the law." Ibid.

"[A] motion for a new trial is addressed to the sound discretion of the trial judge, and the exercise of that discretion will not be interfered with on appeal unless a clear abuse has been shown." State v. Armour, 446 N.J. Super. 295, 306 (App. Div. 2016) (alteration in original) (quoting State v. Russo, 333 N.J. Super. 119, 137 (App. Div. 2000)). "There is no 'miscarriage of justice' when 'any trier of fact could rationally have found beyond a reasonable doubt that the essential elements of the crime were present.'" State v. Jackson, 211 N.J. 394, 413-14 (2012) (quoting State v. Afanador, 134 N.J. 162, 178 (1993)). We "weigh heavily the trial court's 'views of credibility of witnesses, their demeanor, and [its] general feel of the case.'" State v. Carter, 91 N.J. 86, 96 (1982) (alteration in original) (quoting State v. Sims, 65 N.J. 359, 373 (1974)).

N.J.S.A. 2C:11-3(a) provides that "criminal homicide constitutes murder when: [] (1) The actor purposely causes death or serious bodily injury resulting

in death; or [] (2) The actor knowingly causes death or serious bodily injury resulting in death . . . ."  Thus, for serious bodily injury murder (SBI murder), the State needs to prove that a defendant "[(1)] knowingly or purposely inflicted serious bodily injury with <u>actual knowledge</u> that [(2)] the injury created a substantial risk of death, and that [(3)] it was 'highly probable' that death would result."  <u>State v. Wilder</u>, 193 N.J. 398, 409 (2008) (alterations in original) (quoting <u>State v. Jenkins</u>, 178 N.J. 347, 363 (2004)).  For purposeful SBI murder, the State must prove that "'defendant's <u>conscious object</u> [was] to cause serious bodily injury that then resulted in the victim's death' and that defendant '<u>knew</u> that the injury created a substantial risk of death and that it was <u>highly</u> probable that death would result.'"  <u>Jenkins</u>, 178 N.J. at 362 (alteration in original) (quoting <u>State v. Cruz</u>, 163 N.J. 403, 417-18 (2000)).

To sustain "'knowing' SBI murder, the State must make the same showing, except that, rather than proving that serious bodily injury was defendant's conscious objective, it need only demonstrate that he 'was <u>aware that it was</u> <u>practically certain</u> that his conduct would cause serious bodily injury.'"  <u>Id.</u> at 362-63 (quoting <u>Cruz</u>, 163 N.J. at 418).

The Supreme Court has delineated the key differences between aggravated manslaughter and SBI murder.  <u>Wilder</u>, 193 N.J. at 409; <u>Jenkins</u>, 178 N.J. at

362-63; <u>Cruz</u>, 163 N.J. at 417-18. A defendant commits aggravated manslaughter when "recklessly caus[ing] death under circumstances manifesting extreme indifference to human life." <u>Wilder</u>, 193 N.J. at 409 (alteration in original) (quoting N.J.S.A. 2C:11-4). Aggravated manslaughter differs in that it "does not require an intention to cause serious bodily injury or an awareness that death is '<u>practically certain</u>' to follow." <u>Ibid.</u> (quoting <u>Cruz</u>, 163 N.J. at 417-18). Extreme indifference to human life focuses "not on the defendant's state of mind, but on the circumstances under which the defendant acted." <u>Ibid.</u> (quoting Cannel, <u>N.J. Criminal Code Annotated</u>, cmt. 2 on N.J.S.A. 2C:11-4 (2007)). Therefore, if a "defendant <u>disregarded</u> only a '<u>possibility</u>' of death, the result is reckless manslaughter." <u>Jenkins</u>, 178 N.J. at 363.

In denying defendant's application, the judge noted the overwhelming proofs that defendant caused the victim's death, satisfying the first element necessary for first-degree murder. The extent of the injuries, established by the medical examiner's testimony, and corroborated by autopsy photographs and other medical records, included a "broken neck, broken ribs, and . . . the mauling of his head to the point where his ear" was torn, the cartilage visible. The judge opined the injuries demonstrated that the assault was far more than just an effort to thwart a sexual advance.

Moreover, defendant's conduct following the attack, including his change of clothing and hairstyle, and his "remarkable memory as to extraordinary details" demonstrated that defendant was not believable. Despite remembering everything regarding his first meeting with Galfy, and the topics of their conversation, he could not remember the whereabouts of his stained clothing. Defendant discarded his phone and falsely told Conley-Burns that he had reported the alleged assault to police. He left New Jersey and was on his way to Georgia. Thus no "manifest denial of justice under the law" occurred, much less one that required a new trial.

The judge's decision was sound, supported by the record, and not a clear abuse of discretion. The medical examiner testified that Galfy died from blunt force trauma from many blows over his body, including to his eyes, mouth, ears, the back of his head, his neck, his shoulders, arms, and ribs. Blood splatters in the bedroom surrounded the victim. Galfy was a seventy-four-year-old man, smaller in stature than defendant, and the severity and number of his injuries supported the jury's conclusion that defendant knew his actions created substantial risk of death, or that he was aware that death was practically certain to result. The repeated crushing blows demonstrated defendant's intent to cause serious bodily injury. See Wilder, 193 N.J. at 409.

The jury heard and rejected defendant's testimony regarding the defenses of involuntary intoxication and self-defense. The court instructed the jury as to their role as factfinders and their duty to determine the credibility of the witnesses, tracking the model jury charges. Model Jury Charges (Criminal), "Criminal Final Charge, Function of the Jury" (rev. May 12, 2014). It also instructed the jury on purposeful and knowing serious bodily injury murder, as well as the required elements of passion/provocation manslaughter and aggravated/reckless manslaughter.[3] The court further instructed on self-defense and involuntary intoxication.[4] Therefore, the jury was fully apprised and aware of their options to convict defendant of the lesser-included crimes but decided instead that the evidence supported SBI murder.

The record does not suggest a miscarriage of justice occurred. The jury assessed defendant's testimony and proffered defenses and rejected them. The judge did not abuse his discretion by denying defendant's motion for a new trial.

---

[3] Defendant does not challenge these jury instructions.

[4] These instructions are challenged on appeal and will be addressed in Point VIII.

## II.

Defendant asserts both in his counseled and uncounseled brief that he received ineffective assistance of counsel. He anchors this argument on trial counsel's examination of the medical examiner, decision not to cross-examine a State's witness, and discussion in summation of a portion of defendant's testimony. We do not comment on the merits of any of the claims, deferring to post-conviction review. These issues cannot be resolved based on the trial record alone. See State v. Hess, 207 N.J. 123, 145 (2011). Counsel's trial strategy, which informed the manner in which he conducted his examination of witnesses and the formulation of his closing statement, cannot be gleaned from this record. See ibid.

## III.

Defendant claims that the court should have struck portions of the medical examiner's testimony sua sponte. Specifically, he objects to the following:

> Q. Could [the injury to Galfy's right ear] have been caused, say, from if Mr. Galfy was on the ground and a foot came down, hit the ear and came -- in a downward fashion, something of that nature?
>
> A. It could be consistent.
>
> . . . .

21

Q. Could [the swelling in Galfy's brain] have come from a knee hitting him somewhere on the head . . . ?

A. It's possible.

Q. Could it have come from a fist?

A. Yes.

Q. An elbow?

A. Yes, but I don't see any pattern injury where I can categorically say that it was one of those objects.

Q. What about a stomp?

Could it have come from a stomp?

A. Yes.

We review this claim employing the plain error standard of review, as defendant did not object at the time. Thus, defendant needs to establish that the error was "clearly capable of producing an unjust result." State v. Prall, 231 N.J. 567, 581 (2018) (quoting R. 2:10-2).

N.J.R.E. 702 informs our analysis. The answers defendant describes as unreliable were nothing more than responses given by the expert to hypothetical questions. After the hypotheticals were posed, defendant's attorney thoroughly cross-examined, exploring the expert's use of phrases such as "could have been"

22

or "possibly," establishing that he was not rendering an opinion to a medical certainty. See State v. Martini, 131 N.J. 176, 259-60 (1993) (stating opposing counsel may cross-examine an expert witness to question the expert's opinions on hypothetical situations presented on direct).

The mere fact that the medical examiner responded to hypotheticals put to him by the prosecutor did not create error. He was conclusive regarding the injuries suffered by the victim, and that the injuries caused his death. That defense counsel appropriately elicited that the expert could not identify what part of the assailant's body caused which injuries, does not in any way weaken the foundation of his testimony—that the multiple injuries inflicted upon Galfy constituted homicide.

Furthermore, the trial court instructed the jury that it could either accept or reject expert testimony at its discretion. Model Jury Charges (Criminal), "Expert Testimony" (rev. Nov. 10, 2003). The court's failure to sua sponte strike the testimony was not clearly capable of producing an unjust result.

IV.

Defendant also contends that the prosecutor's summation unfairly mischaracterized his testimony and that of the medical examiner. If a prosecutor makes impermissible commentary in his or her summation, the court must weigh

"the severity of the misconduct and its prejudicial effect on the defendant's right to a fair trial . . . ." State v. Wakefield, 190 N.J. 397, 437 (2007) (quoting State v. Papasavvas, 163 N.J. 565, 625 (2000)). The reviewing court will review a conviction based on prosecutorial misconduct if "the conduct was so egregious as to deprive defendant of a fair trial." Ibid. (quoting Papasavvas, 163 N.J. at 625).

For a prosecutor's comment to require a new trial, however, "there must have been 'some degree of possibility that [the prosecutor's comments] led to an unjust result.'" State v. McNeil-Thomas, 238 N.J. 256, 276 (2019) (alteration in original) (quoting State v. R.B., 183 N.J. 308, 330 (2005)). The possibility of an unjust result "must be real, one sufficient enough to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached." Ibid. (alteration in original) (quoting R.B., 183 N.J. at 330).

"Prosecutorial comments are deemed to have violated the defendant's right to a fair trial when they 'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.'" Jackson, 211 N.J. at 409 (alteration in original) (quoting State v. Koedatich, 112 N.J. 225, 338 (1988)). Whether the comments had the capacity to deprive defendant of a fair trial is

24                                                                                    A-4519-18

decided "within the context of the trial as a whole." State v. Feaster, 156 N.J. 1, 64 (1998).

"In determining whether the prosecutor's comments were sufficiently egregious to deny defendant a fair trial," the reviewing court considers "the tenor of the trial and the responsiveness of counsel and the court to the improprieties when they occurred." State v. Timmendequas, 161 N.J. 515, 575 (1999). The consideration includes "whether defense counsel made a timely and proper objection, whether the remark was withdrawn promptly, and whether the court ordered the remarks stricken from the record and instructed the jury to disregard them." Id. at 575-76 (quoting State v. Ramseur, 106 N.J. 123, 322-23 (1987)).

Generally, if counsel does not object to the remarks at trial, "the remarks will not be deemed prejudicial." Id. at 576. By not making a timely objection, defense counsel indicates a belief that "the remarks were [not] prejudicial at the time they were made." Ibid. The lack of an objection "also deprives the court of the opportunity to take curative action." Ibid. Nevertheless, even if defense counsel does not object, the "prosecutor's remarks and actions must at all times be consistent with his or her duty to ensure that justice is achieved." Ibid. (quoting State v. Long, 119 N.J. 439, 483 (1990)).

25

Because defense counsel did not object to the prosecutor's summation statements, defendant must demonstrate plain error. See ibid. "Plain error is 'error possessing a clear capacity to bring about an unjust result and which substantially prejudiced the defendant's fundamental right to have the jury fairly evaluate the meris of his defense.'" Ibid. (quoting State v. Irving, 114 N.J. 427, 444 (1989)).

Defendant cites to the following as an example of prosecutorial misconduct:

> Ladies and gentlemen, as you watched Dr. Shaikh testify, there was a reason for this. There is a reason we went through every single mark. Every time I asked him, Doctor, could that have been a different hit? Absolutely, it could have been another hit . . . . Remember that over and over and over?

Additionally, defendant contends that the prosecutor presented the killing in an inflammatory manner, introducing the unfounded theory that defendant "stomped" the victim to death. We do not agree. The prosecutor's statements were reasonable inferences drawn from the medical examiner's testimony. It was up to the jury to accept or reject those inferences. See R.B., 183 N.J. at 330.

With regard to defendant's contention that the prosecutor mischaracterized defendant's testimony, he points us to the following:

Now, let's just play the game this did happen. Why would [seventy-four]-year-old [Galfy], the heart condition [sic], then try in any way to drag a six-foot, 175 pound [defendant] -- whatever he weighs -- back to the bedroom? Why not just assault him where he lies? Wouldn't that be a heck of a lot easier than trying to get him to the bedroom? But not even in the bed, allegedly dump[ing] him on the floor? But we know who's found on the floor and it's not [defendant] because he's here. None of that makes sense. But the memory keeps getting better as last week's story continues.

These comments were unobjectionable.

At trial, defendant said he recalled sitting with the victim in the living room, "feeling warm and fuzzy, and the last thing [he] remember[ed] [was] hearing the Jeopardy theme and then [he] was on the floor of [Galfy's] room on [his] back." The prosecutor's comments pointed out to the jury the weakness in defendant's description of the manner in which the killing occurred. He drew permissible inferences from the evidence, which the jury was free to accept or reject.

V.

Defendant also contends that the trial court's application of aggravating factor one during sentencing was improper double counting of the evidence used to establish the offense. He argues that the nature of the attack, namely, a beating resulting in death, satisfied the statutory element for murder and

27

therefore made the circumstances unavailable as support for aggravating factor one.

But as the Court said in State v. Fuentes, 217 N.J. 57, 75 (2014), "a sentencing court may justify the application of aggravating factor one, without double-counting, by reference to the extraordinary brutality involved in an offense." So long as the injuries exceeded those required to satisfy the statutory element, this factor is available because the conduct "extended to the extreme reaches of the prohibited behavior." Ibid. (quoting State v. Henry, 418 N.J. Super. 481, 493 (Law Div. 2010)).

In this case the injuries exceeded those necessary to cause death. Therefore, it was not error for the court to find aggravating factor one.

## VI.

Defendant also contends that the court erred in barring testimony from him and others regarding the victim's vacations out of the country, which defendant described as "like kind of creepy." Additionally, defendant claims the victim told him about a "young friend" that lived with him and who, whenever guests were present, would become very intoxicated. Defendant asserts the testimony was relevant under N.J.R.E. 404(b) to help establish for

A-4519-18

the jury his reasonable belief of the need to defend himself from Galfy's sexual advances.

When considering the trial court's evidentiary rulings, we employ a deferential abuse of discretion standard, reviewing the rulings "only for a 'clear error in judgment.'" State v. Medina, 242 N.J. 397, 412 (2020) (quoting State v. Scott, 229 N.J. 469, 479 (2017)). An appellate court may "not substitute [its] judgment for the trial court's unless its 'ruling "was so wide of the mark that a manifest denial of justice resulted."'" Ibid. (quoting State v. Brown, 170 N.J. 138, 147 (2001)).

For evidence to be admissible at trial, it "must be relevant—that is, it must have 'a tendency in reason to prove or disprove any fact of consequence to the determination of the action.'" State v. Sanchez-Medina, 231 N.J. 452, 462 (2018) (quoting N.J.R.E. 401). The court's "inquiry focuses on 'the logical connection between the proffered evidence and a fact in issue,'" and "[e]vidence need not be dispositive or even strongly probative in order to clear the relevancy bar." State v. Buckley, 216 N.J. 249, 261 (2013) (quoting Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 15 (2004)). The court should ask "whether the thing sought to be established is more logical with the evidence than without it." Ibid. (quoting State v. Coruzzi, 189 N.J. Super. 273, 302 (App. Div. 1983)).

"Even if relevant, 'evidence may be excluded if its probative value is substantially outweighed by the risk of . . . undue prejudice, confusion of issues, or misleading the jury.'" Sanchez-Medina, 231 N.J. at 462 (alteration in original) (quoting N.J.R.E. 403). For evidence to be admissible it "must be 'relevant to a material issue,' and its probative value 'must not be outweighed by its apparent prejudice.'" Id. at 465 (quoting State v. Cofield, 127 N.J. 328, 338 (1992)).

The court did not err in keeping this testimony out. Barring cross-examination of a neighbor regarding a prior occupant of the victim's home, or defendant from testifying about Galfy's alleged "creepy" vacations was a reasonable exercise of discretion. The evidence was not of "other crimes, wrongs, or acts," N.J.R.E. 404(b), and was not relevant. It constituted highly speculative suggestions intended to bolster defendant's theory that he needed extreme force to fend off Galfy's alleged sexual overtures. Galfy's vacations and that he previously lived with a young man had little relevance to the trial issues. Any minimal probative value it had was substantially outweighed by the potential for undue prejudice or confusion. See Sanchez-Medina, 231 N.J. at 462; N.J.R.E. 403.

A-4519-18

## VII.

Defendant also argues that cumulative error prevented him from receiving a fair trial. Since we conclude no error occurred, the point does not warrant further discussion in a written opinion. R. 2:11-3(e)(2).

## VIII.

Defendant in his uncounseled brief raises many points for which there is little support in the record. Overall, they do not warrant extended discussion in a written opinion. R. 2:11-3(e)(2).

Defendant revisits the denial of his motions for change of venue. The victim was a former law partner of the criminal presiding judge in the county where he was tried. The partnership ended some thirteen years before the trial. So long as that judge did not preside over any aspect of the matter, the Assignment Judge who heard defendant's motion did not consider removal necessary. See In re Advisory Letter No. 7-11 of the Sup. Ct. Comm., 213 N.J. 63, 77 (2013). We agree.

Additionally, the trial judge on the record commented that he had seen the video that launched defendant to internet fame. Defendant views this act as highly prejudicial but does not identify the prejudice.

31

Defendant asserts there were multiple times in the courtroom during which he claims he was treated disrespectfully. Occasionally, the record establishes the judge became frustrated with the proceedings, and with defendant's conduct in the courtroom. These instances were rare, did not affect the legal rulings, and could not have prejudiced the jury's verdict.

Defendant also seems to argue that the court erred in instructing the jury on involuntary intoxication because there was insufficient evidence to warrant the charge being given. During the charge conference, counsel said he wanted the instruction, but that his client did not. A trial judge may deliver a charge when a defendant objects to it only if the facts "clearly indicate" that the proposed charge is appropriate. State v. Choice, 98 N.J. 295, 298 (1985).

"[W]here counsel requests a charge on a defense, it will be given if there is a rational basis in the evidence to do so." State v. R.T., 205 N.J. 493, 509 (2011) (Long, J., concurring). The Supreme Court has also stated that "[t]rial courts must carefully refrain from preempting defense counsel's strategic and tactical decisions and possibly prejudicing defendant's chance of acquittal." State v. Perry, 124 N.J. 128, 162 (1991).

Applying these standards, the instruction was not error. Defendant testified that the victim served him beer, that he experienced an unusual taste in

his mouth the following morning and felt "fuzzy" after consuming it. Although defendant did not explicitly say so, he was implying that Galfy drugged him so he could sexually assault him. The judge had to give the charge under these circumstances because the defense depended in part on that claim.

For the first time on appeal, defendant asserts he should have been permitted to call the prosecutor and the judge as witnesses. Defendant believes the State did not do sufficient testing on the material gathered from the crime scene, and that the judge denied seeing sheriff's officers laughing at his recorded statement when it was played to the jury. These requests are procedurally improper and have no foundation in the record.

Defendant requested and was denied an adverse inference instruction during the trial. He alleges the State should have administered a rape kit, tested a towel found at the crime scene for semen, and conducted forensic investigation to support his theory of the case. The adverse inference instruction, however, is appropriate when the alleged "spoliator destroyed or otherwise concealed [evidence that] would have been unfavorable . . . ." State v. Dabas, 215 N.J. 114, 140 n.12 (2013) (quoting Rosenblit v. Zimmerman, 166 N.J. 391, 401-02 (2001)). Failure to test does not, standing alone, justify or constitute a basis for the instruction.

Finally, defendant contends that he should have been permitted to represent himself. Defendant's motion to represent himself was denied on January 7, 2019, because of procedural missteps prior to the start of trial. Defendant never refiled even though the judge clearly explained to him that the issue would not be reached at that point.

Defendant also complains that his motion for self-representation at sentencing should have been granted. At that time, the judge did ask defendant some of the questions routinely posed to determine if defendant's decision was being made knowingly and intelligently. See State v. Reddish, 181 N.J. 553, 593-95 (2004) (explaining the court must make inquiries about defendant's knowledge regarding the implications concerning his right against self-incrimination, waiver of ineffective-assistance-of-counsel claims, and "the nature and consequences of his waiver," and that these questions must be "open-ended" so defendant describes his understanding "in his own words"); see also State v. King, 210 N.J. 2, 19-20 (2012).

During the oral argument on defendant's motion, the court stressed that defendant's conduct in the courtroom, and relationship with serial attorneys, demonstrated that his wish to proceed pro se was nothing short of an "attempt to manipulate the [c]ourt proceedings as he ha[d] attempted to do so throughout

the entirety of the trial." In the judge's opinion, the application was a step taken only to delay the process. The judge noted that under State v. Drew, 383 N.J. Super. 185, 200 (App. Div. 2006), a defendant must demonstrate a willingness to comply with rules of procedure and courtroom protocol in order to effectively waive his right to counsel—which defendant had not.

The judge observed defendant had "been hostile, aggressive, noncompliant, ha[d] repeatedly ignored serial admonitions from [the] [c]ourt over and [over] again," and that "his conduct ha[d] been serially contemptuous" and "deviously calculating." As an example, the court cited defendant's reference to the viral video of his news interview during his testimony "knowing the great lengths [to which] the lawyers and the [c]ourt went . . . to ensure there would be no such reference to the clearly irrelevant[,] inadmissible and highly prejudicial video interview or the incident that led to the video." The judge referenced other instances where defendant outright disregarded the court's rulings. Additionally, during an "unrestrained outburst" outside the presence of the jury, defendant described his trial as a "kangaroo court." Even as the judge was rendering his decision on defendant's motion to represent himself, defendant continuously interrupted him. Accordingly, the judge's decision was not an abuse of discretion.

Any other claim of error not explicitly addressed in this opinion is too lacking in merit to warrant further discussion.  R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION