# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2877-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MADISON GULLETT,

    Defendant-Appellant.

_____

> Submitted January 23, 2025 – Decided February 10, 2025
>
> Before Judges Mawla and Vinci.
>
> On appeal from the Superior Court of New Jersey, Law Division, Gloucester County, Indictment No. 18-05-0446.
>
> Law Offices of Melissa Rosenblum, attorneys for appellant (Melissa Rosenblum, of counsel and on the briefs; Marissa Keddis, on the briefs).
>
> Elizabeth Parvin, Acting Gloucester County Prosecutor, attorney for respondent (Michael C. Mellon, Special Deputy Attorney General/Acting Assistant Prosecutor, on the brief).

PER CURIAM

Defendant Madison Gullett appeals from the May 4, 2023 judgment of conviction entered following his conviction by a jury for first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1); second-degree sexual assault, N.J.S.A. 2C:14-2(b); and second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1)(f). He also challenges an April 24, 2023 order denying his motion for a new trial. We affirm.

I.

The State alleged defendant sexually assaulted his girlfriend's daughter, J.S., on one occasion in 2006 when she was five years old.[1] On July 11, 2017, Detective Louis Damminger of the Greenwich Township Police Department (GPD) received a written report (the 2017 DCPP report) from New Jersey Division of Child Protection and Permanency (DCPP) employee Shanna Johnson regarding J.S.'s allegations.[2] It stated:

> Reporter is calling to report concerns involving child J.S.
>
> . . . Delaware [Child Protective Services (Delaware CPS)] received a report today stating that

---

[1] We use initials to protect records relating to child victims of sexual assault or abuse. R. 1:38-3(c)(9).

[2] Neither the 2017 DCPP report nor any other DCPP documents are included in the record on appeal. We discern the contents of those records solely from the court's description of them.

> J.S. is currently at MeadowWood Behavioral Health
> Center, . . . for treatment. The child disclosed that
> when she was about five years old[,] her stepfather,
> [defendant], sexually abused her at one time by rubbing
> up against her. She said it may have been reported and
> investigated already. She did not provide any other
> details about the abuse.

The report also stated Johnson personally interviewed J.S., who alleged "[defendant] placed his hand inside of her underwear[] and had skin to skin contact with her vagina. [Sh]e did not indicate that there was penetration."

On July 26, 2017, defendant was charged with aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1), criminal sexual contact, N.J.S.A. 2C:14-3(b), endangering the welfare of a child, N.J.S.A. 2C:24-4(a), and harassment, N.J.S.A. 2C:33-4(b). The affidavit of probable cause signed by Detective Steven Gurick of the GPD stated:

> In the spring of 2007[, defendant] entered the victim's
> bedroom and sat on her bed. He then inserted his finger
> into her vagina. He told the victim that if she said
> anything about the incident, he would hurt her and her
> mother. The victim was [five] years old at the time of
> the abuse.
>
> I conducted interview[s] of the victim and the
> victim's mother. I also spoke with Salem County
> [DCPP] officials [who] have knowledge of this case.

3

On May 30, 2018, defendant was indicted for aggravated sexual assault, sexual assault, and endangering the welfare of a child. The indictment alleged the sexual assault occurred between April 1, 2007 and June 30, 2007.

Defendant moved to compel production of all DCPP records. On July 15, 2019, the first of three judges assigned to the case entered an order compelling DCPP to "release to [the c]ourt, for an in camera review, any and all records relating to investigations concerning J.S.," including "all records of child abuse reports made, all information obtained by the Department of Children and Families in investigating such reports, and all reports of findings forwarded to the child abuse registry, and all communications with law enforcement and outside agencies."

The parties and the court were unable to determine what, if anything, happened in response to that order. Defendant's trial counsel contended DCPP never responded to the order, but also advised the court he may have lost the documents "when his computer crashed." The State contended it previously produced a copy of the 2017 DCPP report but did not have any record of doing so. The trial judge, the third judge assigned to the case, could not find any evidence of DCPP records being received or reviewed by his predecessor judges.

A-2877-22

On June 7, 2022, jury selection began. On June 9, the trial judge entered a protective order and order for DCPP records identical to the July 15, 2019 order, except it also compelled Johnson to "appear and testify pursuant to subpoena."[3]

On June 14, the State delivered the 2017 DCPP report to the court for in camera review. On June 15, defendant made an oral application to dismiss the indictment, declare a mistrial, or adjourn the trial arguing "the State . . . withheld exculpatory evidence." Counsel explained "earlier [that] week, [he] received an email from [his] investigator with a response from the Deputy Attorney General responding for" DCPP.[4] Based on that response, he "learned that, not only are there exculpatory statements in the [DCPP] records from . . . the 2017 investigation, . . . [t]here was a 200[8 DCPP] investigation that we knew nothing about." He argued:

> There was an investigation into this family, maybe [J.S.] directly. In 2008, which is very close in time to the date of these allegations. We . . . do[ not] have any substantiated abuse, [or] neglect allegations. [J.S.] may have been directly asked, has anyone hurt you, has anyone physically abused you? She may have said no. . . . [E]ven if she does[ not] make those specific statements, if she[ is] questioned, if she[ is]

---

[3] The record does not reflect what led the court to enter the June 9 order.

[4] The email is not included in the record on appeal.

5

interviewed, if the family is questioned and interviewed, I think it[ is] exculpatory that nothing came from that, no statements were made as to any abuse allegedly committed by [defendant].

The court reviewed the 2017 DCPP report and noted it was comprised of seventeen pages sent by DCPP to Detective Damminger on July 11, 2017. It "found that a portion of those records should be provided to defense counsel." Specifically, "pages one, and a portion of page two of six." "[T]he balance of the records, . . . pages . . . three through six . . . and . . . an additional attachment of ten other documents, were not relevant . . . . [T]hey concerned [defendant], but did not concern J.S. at all, . . . nor the subject matter of this proceeding."

The court noted there was no evidence any DCPP records were ever received and reviewed by the court after entry of the July 15, 2019 order, "[b]ut . . . the fact remains . . . that nothing happened after the order requiring them to be produced. . . . Nothing happened from that time that this [c]ourt [could] see." The court found

> it is the delay in raising this issue until we[ are] in the midst of jury selection that is the problem in this case. . . . [I]t[ is] not like the . . . State purposely withheld the information from . . . defendant. The defense did not follow up on asking for the records until just now.

The court denied the application for dismissal or a mistrial but determined it would compel the appearance and testimony of DCPP employee Sharon Perez, in addition to Johnson, because Perez may have played a role in preparing the 2017 DCPP report. Defense counsel confirmed, "as far as adjourning or giving the defense time, the [c]ourt has stated that it will give the defense time to subpoena . . . Perez. [Johnson] is already subpoenaed[] and has been asked to show up tomorrow . . . ." The same day, the court entered an order compelling the appearance and testimony of Perez and Carol Brooks, the DCPP worker assigned to the case.

On June 15, jury selection concluded, and the jury was sworn. J.S. testified defendant was her mother's partner and lived with her and her mother, Terri Hoff, in a two-bedroom apartment in Gibbstown. J.S. was five years old when defendant lived with them. Her sister, K.G., who is defendant's biological daughter, was born on July 31, 2006, while defendant lived with J.S. and Hoff.

J.S. testified defendant entered her bedroom "late at night . . . like, early morning, next morning" when she was five years old and in kindergarten. He had never done that before. J.S. "remember[ed] him touching [her] on [her] private area . . . the front side of [her] private area," meaning "[her] vagina." She "was in shock" and did not say anything. J.S. testified defendant touched

A-2877-22

"the top half" of her vagina and "remember[ed] . . . feeling something go in." She did not recall how long the incident lasted. While he was touching her, defendant said, "[d]o[ not] say anything or I[ will] hurt you and your mom."

J.S. "realize[d] what happened" when she was fourteen. Over defendant's objection, J.S. testified the abuse "made [her] feel less of a person just to know that . . . something was taken from [her] at a young age that [she] could never get back." She continued as follows:

> [STATE]: What happened in your life after you realized this happened?
>
> [J.S.]: Like . . . I became more insecure with myself and . . . I did[ not] know what way to go as far like right or left and like I did[ not] know how to just confine within myself, . . . I felt so belittled as a person . . . and it[ is] like, at the time, I did[ not] know how to talk about it or reach out for help or anything, so I was just drowning. I did[ not] know what to do, honestly . . . it was hard.

On cross-examination, J.S. testified she recalled speaking with the police but did not recall speaking with anyone from DCPP. She did not recall if the abuse happened before or after K.G. was born. She could not recall how long the sexual abuse lasted, but she "just remember[ed] it going inside" and that "it hurt."

Detective Gurick testified he became involved with the case on July 11, 2017, when GPD was contacted by Johnson.  On July 14, he interviewed J.S. and Hoff.  He did not conduct any physical examination because of the passage of time and did not collect any evidence from their residence because they were living in a different location.

On cross-examination, defense counsel asked Detective Gurick, "[s]o your investigation did not include the size of the apartment[?]" to which he responded he was "familiar with the apartment.  [He had] been in the apartment before." Counsel did not object to that response or request a curative instruction but continued to question Detective Gurick about whether he asked J.S. to describe the layout and size of the apartment when he interviewed her.  On redirect examination, over the objection of defense counsel, Detective Gurick testified he was "familiar with that residence" but it had "been some time since [he had] been in the apartment."

Hoff testified she lived with defendant for "about a year" in Gibbstown. K.G. was born while they lived there.  Defendant "was just like a stepdad" to J.S.  He did not regularly watch or take care of J.S., and Hoff "very rarely" left her with defendant when she went out.  On cross-examination, however, Hoff

9

testified she did sometimes leave J.S. with defendant for her entire eight-hour shift when she was at work.

Over defense counsel's objection, Hoff testified on one occasion she found defendant exiting J.S.'s bedroom. She "was sleeping" and "heard a noise. [J.S.] yelled . . . screamed . . . . Kind of like a scream" so she went "to [her] daughter's room to check her out." She found defendant "coming out of [J.S.'s] room, as [she] was approaching her room." Hoff "tried to go to the room to check on [J.S.], and, as [defendant] was coming out, he . . . refused to let [her] go in there and see [J.S.]." She "kept trying to push back to go in to go check on [her] daughter" but was not able to get in. Defendant told her he "got it. [He] handled her" and "was getting to the point of physical . . . so [she] could[ not] get in there to check on her." She "walked away, so [she] would[ not] fight in front of [her] daughter."

Before resting, the State moved to amend the indictment pursuant to Rule 3:7-4 based on an error it "caught [that] afternoon;" the indictment "says '2007.' It should say '2006.'" The State argued, it "simply does[ not] make sense. Everybody was aware that this happened when she was five. That would have been in 2006."

Defendant opposed the motion arguing it was untimely and prejudicial. Specifically, "part of [his] defense [is] that they do[ not] even know when this happened" and the amendment "relates directly to the timing" of the incident and whether K.G. was born at the time. The late amendment gave him "no opportunity to prepare a different defense or perhaps even a better defense."

The court granted the motion to amend. It determined the proposed amendment did not change the nature of the offenses for which defendant was indicted and was only to correct an "arithmetical error" in the form or description of the charged offenses. The court found defendant was not prejudiced because the documents and evidence in the case all indicated the incident occurred when J.S. was five years old and her date of birth was included in the indictment. In addition, defendant did not have an alibi defense that would be affected by the amendment. The court determined it would instruct the jurors the indictment was amended and permitted defendant to "reference" the amendment "to preserve [his] argument that the State lacks the knowledge of when the event took place."

On June 16, Johnson appeared and provided certain DCPP documents.[5] She advised the court, she "only [had her] paperwork that [she] had to print off.

---

[5] Again, these documents are not included in the record on appeal.

[She] did[ not] have the records."  But she "believe[d] they were requested." Johnson then provided twenty to thirty pages of documents that were delivered to counsel prior to the court's lunch break.

Defense counsel advised the court he received an email from DCPP indicating Perez and Brooks would not appear for trial.  In response, the court entered an order to show cause "why [DCPP] should not be held in contempt for not appearing . . . and ordering both of them to be [in court] Monday morning [June 20]."

Johnson was called as a defense witness.  She testified that in 2017 she investigated claims of abuse by J.S., and J.S. made a statement to her that she "recorded . . . in the system provided to [her] by [DCPP]" and which is "now contained in a writing."  Counsel asked whether J.S. said defendant penetrated her vagina, and she responded "no."  Johnson was not asked any questions about information contained in the DCPP records, including the document she produced earlier that day.  On cross-examination, Johnson testified J.S. "told [her] she was touched on her private area," and she did not ask J.S. if there was "penetration" because that is "the police's job."

Following Johnson's testimony, the defense rested.  Counsel did not request additional time to compel the appearance and testimony of Perez and

Brooks despite the court's stated intention to adjourn the trial until Monday, June 20, to permit that.

On June 21, 2022, the jury convicted defendant on all counts. He moved for a new trial pursuant to Rule 3:20-1, arguing: (1) the State failed to produce the DCPP records in violation of its discovery obligations and Brady v. Maryland, 373 U.S. 83 (1963); (2) the court failed to properly instruct the jury after it was required to re-read a portion of the instructions to correct an error; (3) defendant was prejudiced by the amendment to the indictment; (4) the court erred by permitting Detective Gurick to testify he was previously in the apartment; (5) the court erred by permitting Hoff to testify she saw defendant coming out of J.S.'s bedroom; and (6) the court erred by failing to dismiss the second-degree endangering the welfare of a child charge.

On April 24, 2023, after hearing oral argument, the court entered an order denying the motion supported by an oral opinion. As to the alleged discovery and Brady violations, the court found defendant did not obtain the DCPP records prior to jury selection because the issue was never raised by defense counsel after the 2019 order relating to DCPP records was entered. It also found Johnson, "who was specifically involved with the interview of [J.S.]," testified at trial regarding J.S.'s 2017 statement. The court noted defense counsel "chose

not to pursue the other [DCPP] workers," and "to the extent . . . there are records from 2008 at all. The subpoena was not enforced . . . nor were they addressed . . . by defense counsel prior to the commencement of trial."

The court rejected the claim the jury charge was confusing because it "went meticulously back through the instructions and did[ not] just piecemeal the initial charge that was read in error." It found defendant was not prejudiced by the amendment to the indictment because it corrected a typographical error, and defendant was always aware of J.S.'s allegations. Detective Gurick only stated he had been in the apartment before. He did not say why and did not testify regarding any other crimes or wrongs in violation of N.J.R.E. 404(b). Hoff's testimony was relevant because she saw defendant coming out of J.S.'s room on one occasion and J.S. testified defendant sexually assaulted her on the single occasion he entered her room at night. The court found there was sufficient evidence to support the second-degree endangering charge because the testimony established defendant stood "in loco parentis" and had "supervisory duties and authority over" J.S. It denied the motion, finding "there has not been a manifest denial of justice."

After an appropriate merger, defendant was sentenced to ten years, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, for first-degree

14

aggravated sexual assault. He was sentenced to a concurrent term of seven

years, subject to NERA, for second-degree endangering the welfare of a child.

He was also sentenced to the reporting and registration requirements of Megan's

Law, N.J.S.A. 2C:7-2, and parole supervision for life, N.J.S.A. 2C:43-6.4.

Defendant raises the following points on appeal.

POINT I

THE TRIAL COURT COMMITTED A MULTITUDE OF REVERSIBLE ERRORS THAT WARRANT A NEW TRIAL.

A. The Trial Court Committed Reversible Error In Concluding That The State Did Not Violate Its Obligation To Turn Over Exculpatory Evidence/Records In Violation Of . . . Rule 3:13-3 And Brady That Was In The State's Possession.

B. The Trial Court Committed Reversible Error By Failing To Sanction The State For Its Non-Compliance With An Order Compelling The Production Of Records From The 2008 DCPP Investigation In Violation of Brady and . . . Rule 3:13-3.

C. The Trial Court Committed Reversible Error In Allowing The State To Amend The Date Of The Incident From 2007 To 2006 After All The State Witnesses Testified. The State's Last-Minute Amendment Violated [Defendant's] . . . Due Process Rights And Right To A Fair Trial.

D. The Trial Court Committed Reversible Error In Allowing [Officer Gurick's] Testimony That

He Had Previously Been At The Apartment In Violation Of New Jersey Rule[] Of Evidence 403 And For Not Providing Any Curative Jury Instructions.

E. The Court Committed Reversible Error In Allowing The Admission Of [Hoff's] Testimony Of Seeing Defendant . . . Leaving Her Daughter's Room Without Any Testimony As To Date Or Time.

F. The Court Committed Reversible Error In Not Dismissing The Second-Degree Endangering The Welfare Of A Child. No Evidence Was Presented By The State That Defendant . . . Had Any Legal Duty To J.S. On The Contrary, The Evidence By Both J.S. And Her Mother, [Hoff], Demonstrated Defendant Was Not A Caregiver In Any Manner.

G. The Jury Instructions Were Erroneous And The Court's Attempt To Recharge Without Explaining To The Jury That The Initial Instructions Were Given In Error, Created Confusion Without Any Curative Instruction.

H. The Cumulative Errors, Individually And Collectively, Warrant The Granting Of A New Trial.

POINT II

COUNSEL FOR DEFENSE WAS INEFFECTIVE BY NOT ENFORCING [DEFENDANT'S] DUE PROCESS RIGHTS. ACCORDINGLY, DEFENDANT IS ENTITLED TO A NEW TRIAL.

16

POINT III

THE TRIAL COURT MISINTERPRETED AND MISAPPLIED BINDING CASE LAW TO THE DETRIMENT OF [DEFENDANT'S] RIGHT TO A FAIR TRIAL. ACCORDINGLY, DEFENDANT IS ENTITLED TO A NEW TRIAL.

> A. The Trial Court Failed To Weigh The Probative Value Of The Testimony Against Prejudice To . . . Defendant Pursuant To N.J.R.E. 403.

## II.

## A.

The court correctly determined the State did not violate its obligation to timely disclose exculpatory evidence in discovery. A trial court's ruling on a discovery issue "is entitled to substantial deference and will not be overturned absent an abuse of discretion." State v. Stein, 225 N.J. 582, 593 (2016) (citing State v. Hernandez, 225 N.J. 451, 461 (2016)). "Appellate courts 'generally defer to a trial court's resolution of a discovery matter, provided its determination is not so wide of the mark or 'is not based on a mistaken understanding of the applicable law.'" State v. Szemple, 247 N.J. 82, 94 (2021) (quoting State in Int. of A.B., 219 N.J. 542, 554 (2014)). An abuse of discretion typically arises when a trial court's decision is "made without a rational explanation, inexplicably departed from established policies, or rested on an

17

impermissible basis." Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. Immigr. & Naturalization Serv., 779 F.2d 1260, 1265 (7th Cir. 1985)).

The criminal rules of discovery require that the State disclose to defense counsel material or information in its possession that is relevant to the case prior to trial. See R. 3:13-3(b). Such discovery includes material that affects the credibility of a State's witness whose testimony "may be determinative of guilt or innocence." Hernandez, 225 N.J. at 462.

The State did not violate any duty to produce the 2017 DCPP report directly to defendant because it was not permitted to do so absent a court order. Pursuant to N.J.S.A. 9:6-8-10(a), DCPP "records of child abuse reports . . . shall be kept confidential and may be disclosed" to defense counsel only if expressly authorized by court order. Prior to releasing confidential DCPP records to defense counsel, the State is required under N.J.S.A. 9:6-8.10(b)(6), to submit the records to the court for in camera review and a finding that information contained therein is necessary for the determination of an issue before it. In re Z.W., 408 N.J. Super. 535, 538-39 (App. Div. 2009).

In this case, although defendant obtained an order compelling DCPP to release potentially relevant records for in camera review in 2019, there is

nothing to indicate whether the records were released. Defendant contends they were never delivered to him, but his trial counsel also suggested to the court the records might have been lost due a computer problem. The State contends it provided the 2017 DCPP report to the court in response to the 2019 order but does not have any evidence to support that claim. The court likewise could not determine if the records were released and reviewed.

However, on June 14, 2022, immediately upon learning the 2017 DCPP report may not have been received by defendant, the State provided the report to the court for review. The following day, the court delivered the relevant portions of the report to defendant. Considering all the facts and circumstances of the case, we are satisfied the court did not misapply its discretion by finding the State did not violate its discovery obligations.

B.

We also conclude the court correctly determined the State did not commit a Brady violation. A trial court's determination as to whether evidence is subject to disclosure under Brady presents a mixed question of law and fact. State v. Marshall, 148 N.J. 89, 185 (1997); State v. Robertson, 438 N.J. Super. 47, 64 (App. Div. 2014). We give deference to the trial court's supported factual findings but review de novo the court's application of legal rules to the factual

19

finding.  State v. Harris, 181 N.J. 391, 415-16 (2004).

In Brady, the United States Supreme Court held the prosecution's "suppression . . . of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87; accord State v. Carter, 91 N.J. 86, 110 (1982).  Both exculpatory and impeachment evidence is governed by the Brady rule.  United States v. Bagley, 473 U.S. 667, 676 (1985); accord State v. Hyppolite, 236 N.J. 154, 165 (2018).  Three elements must be established to prove a Brady violation:  "(1) the evidence at issue must be favorable to the accused, either as exculpatory or impeachment evidence; (2) the State must have suppressed the evidence, either purposely or inadvertently; and (3) the evidence must be material to the defendant's case."  State v. Brown, 236 N.J. 497, 518 (2019) (citing State v. Nelson, 155 N.J. 487, 497 (1998)).

As to the first factor, the "disclosure rule applies only to information of which the prosecution is actually or constructively aware."  State v. Nelson, 330 N.J. 206, 213 (App. Div. 2000).  "[A] prosecutor's constitutional obligation to provide exculpatory information 'extends to documents of which it is actually or constructively aware, including documents held by other law enforcement personnel who are part of the prosecution team,' because they are 'acting on the

government's behalf in the case . . . .'" State v. Washington, 453 N.J. Super. 164, 184 (App. Div. 2018) (first quoting Robertson, 438 N.J. Super. at 69), then quoting Kyles v. Whitley, 514 U.S. 419, 437 (1995). DCPP is not a law enforcement agency, nor does it act on the State's behalf in a criminal case when it discharges its statutory obligations to investigate reports of abuse or neglect and report its findings to law enforcement. See State v. Buda, 195 N.J. 278, 306-08 (2008).

The second Brady factor concerns favorable evidence. This is generally information that impeaches the testimony of a witness or simply bolsters a defendant's claims. See State v. Henries, 306 N.J. Super. 512, 533 (App. Div. 1997).

The third Brady factor involves the materiality of the evidence that was withheld. State v. Parsons, 341 N.J. Super. 448, 455 (App. Div. 2001). "[E]vidence is material for Brady purposes 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Marshall, 148 N.J. at 156 (quoting Bagley, 473 U.S. at 682). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Nelson, 155 N.J. at 500 (quoting Bagley, 473 U.S. at 682).

Where, as in this case, evidence is disclosed late but prior to or during trial, "determining the third element . . . is far more arduous." Brown, 236 N.J. at 518. "In deciding materiality, 'we must examine the circumstances under which the nondisclosure arose' and '[t]he significance of a nondisclosure in the context of the entire record.'" Id. at 518-19 (alteration in original) (citing State v. Marshall, 123 N.J. 1, 199-200 (1991)). To do so, "we consider the strength of the State's case, the timing of [the] disclosure of the withheld evidence, the relevance of the suppressed evidence, and the withheld evidence's admissibility." Id. at 519.

The court correctly determined the late disclosure of the 2017 DCPP report was not a Brady violation. The State concedes, as it must, Brady factors one and two, namely, that the report was in the possession of GPD, which is a law enforcement agency, and was favorable impeachment evidence of a potentially prior inconsistent statement by J.S.

The critical flaw in defendant's argument concerns Brady factor three: materiality. In accordance with Brown, to decide materiality we must "examine the circumstances under which the nondisclosure arose" and its significance "in the context of the entire record." Id. at 518-19 (quoting Marshall, 123 N.J. at 199-200).

Here, there is no evidence the State intentionally failed to disclose or willfully suppressed evidence. After the court entered the 2019 order for an <u>in camera</u> review of DCPP records, defense counsel did not pursue the matter. The State was unaware defendant did not receive any DCPP records until trial counsel raised the issue during jury selection. If fault for the late production of the 2017 DCPP report must be ascribed to either party, it lies with defendant. The circumstances of the nondisclosure, therefore, weigh heavily against defendant in this case.

Most importantly, defendant received the relevant portions of the 2017 DCPP report prior to the start of trial. On June 15, 2022, before the jury was sworn, the court provided defendant with the two pages it determined had any relevance to the case. This included the substance of J.S.'s potentially inconsistent prior statement to Johnson. Given the extremely limited amount of relevant information contained in the 2017 DCPP report, counsel had adequate time to review it prior to the start of trial the following day. In fact, in his opening statement, counsel told the jury it will "hear that, when [J.S.] first told the story to a worker from [DCPP], she said[:] 'He came into my room[,] and he rubbed me; he put his hands in my panties[;] and he rubbed my vagina.' She never said anything about penetration."

Counsel was also able to obtain Johnson's trial testimony to establish J.S. made the statement. Although it is true Johnson delivered twenty to thirty pages of DCPP records the day she testified, the only questions counsel asked Johnson related to J.S.'s statement. Counsel did not indicate he needed more time to review the records, nor did he request an adjournment for that purpose. Based on the record, counsel had ample time to review the documents Johnson produced and did not find anything new or useful in those documents.

Defendant's contention he was not permitted to call Perez and Brooks as witnesses and possibly obtain additional DCPP records is unsupported by the record. On June 16, 2022, the court entered an order to show cause to compel their appearance and agreed to adjourn the trial for several days to accommodate their testimony. Rather than accept the court's offer of an adjournment, defendant rested immediately following Johnson's testimony without the testimony of Perez or Brooks and without determining if they were in possession of additional relevant DCPP records.

Defendant's claim the court failed to sanction the State for failure to produce "DCPP records from 2008" lacks merit. There is no evidence the State was ever in possession of such records, and it is not deemed to constructively possess or control DCPP records. See Buda, 195 N.J. at 306-08. If any such

24

records exist, defense counsel had a fair opportunity to obtain them long before trial and did not.

## C.

The court appropriately exercised its discretion to grant the State's motion to amend the indictment. We review a trial court's decision to amend an indictment for an abuse of discretion. See State v. Reid, 148 N.J. Super. 263, 266 (App. Div. 1997).

Pursuant to Rule 3:7-4:

> The [judge] may amend the indictment . . . to correct an error in form or the description of the crime intended to be charged . . . provided that the amendment does not charge another or different offense from that alleged and the defendant will not be prejudiced thereby in [their] defense on the merits.

However, the court may not amend "[a]n error relating to the substance or 'essence' of an offense . . . by operation of that [Rule]." State v. Dorn, 233 N.J. 81, 94 (2018). "[T]he analysis as to whether an indictment was sufficient and whether an amendment under Rule 3:7-4 was appropriate hinges upon whether the defendant was provided with adequate notice of the charges and whether an amendment would prejudice [the] defendant in the formulation of a defense." Id. at 96.

The State moved to amend the indictment to allege the incident occurred between April 1, 2006, and June 30, 2006, instead of 2007. All the evidence in the case, including the initial reports to Delaware CPS, DCPP, J.S.'s statement to Detective Gurick, and J.S.'s trial testimony, indicated J.S. was five years old at the time of the incident. The indictment, however, incorrectly identified the year of the incident as 2007, when J.S. was six years old.

As the court correctly determined, the amendment was intended to correct an "arithmetical" error and did not change the offense charged by type or degree. In addition, because defendant was not asserting an alibi defense or any other defense that was dependent on the incident occurring in 2007, his claims of prejudice lacked merit.

Defendant's assertions of prejudice are not convincing. He contends he was prejudiced because "a significant part of [his] argument is that the inaccuracies of the timeline itself, and the faulty recollections of the timeline by J.S. and [Hoff], support the conclusion that the alleged incident . . . did not occur." The amendment, however, did not bolster or rehabilitate their testimony. Neither witness testified when the abuse happened, other than J.S.'s consistent testimony that she was five years old at the time. Moreover, the court allowed

26 <span></span>

counsel to comment on the amendment in his closing, and he used it to argue the State and its witnesses did not know when the incident occurred.

He also argues the amendment was significant because it meant the abuse occurred before K.G. was born. However, J.S. testified she did not recall if K.G. was born when the abuse occurred, and Hoff never testified regarding the timing of the alleged abuse. We are satisfied the court did not misapply its discretion by granting the motion to amend.

D.

We turn to defendant's claims the court mistakenly admitted certain evidence. Given the broad discretion afforded to trial judges, an appellate court evaluates a trial court's evidentiary determinations with substantial deference. State v. Kuropchak, 221 N.J. 368, 385 (2015). "Considerable latitude is afforded" to the court's ruling, which is "reversed only if it constitutes an abuse of discretion." State v. Feaster, 156 N.J. 1, 82 (1998) (citing State v. McDougald, 120 N.J. 525, 577-78 (1990)).

Defendant's claim the court erred by permitting Detective Gurick to testify he was familiar with the apartment where J.S. lived with defendant is precluded by the doctrine of invited error. Under the invited error doctrine, "errors that 'were induced, encouraged or acquiesced in or consented to by defense counsel

ordinarily are not a basis for reversal on appeal.'" State v. A.R., 213 N.J. 542, 561 (2013) (quoting State v. Corsaro, 107 N.J. 339, 345 (1987)).

In an attempt to undermine Detective Gurick's testimony by demonstrating his investigation was superficial, defense counsel endeavored to show he never considered the size of the apartment. In response, Detective Gurick explained "he was familiar with the apartment" because he had "been in the apartment before." Counsel did not object to that testimony or request a curative instruction. The State was entitled to follow up on that testimony on re-direct. Having invited the testimony, defendant will not be heard to claim error on appeal.

The court correctly determined defendant's claim that the testimony constituted improper N.J.R.E. 404(b) evidence of other crimes, wrongs, or acts lacks merit. Detective Gurick did not offer any evidence of other wrongful acts committed by anyone, much less by defendant.

We are not persuaded by defendant's claim the court erred by admitting Hoff's testimony she saw defendant leaving J.S.'s room on one occasion during the night. He contends this testimony was admitted in contravention of N.J.R.E. 401 and N.J.R.E. 403.

Pursuant to N.J.R.E. 401, evidence is relevant if it has "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." When applying N.J.R.E. 403, the trial court conducts a fact-specific evaluation of the evidence in the setting of the individual case to determine if the probative value is substantially outweighed by the risk of undue prejudice.

Hoff testified that on one occasion while she was living with defendant, she heard J.S. yell or scream during the night while she was sleeping. She went to check on J.S. and found defendant leaving her room. He then prevented Hoff from entering the room to check on J.S. This testimony plainly tends to prove a fact of consequence – that defendant entered J.S.'s room on one occasion during the night. We can discern no basis to disturb the court's determination the testimony was relevant, and the probative value was not substantially outweighed by the risk of undue prejudice.

Defendant's claim the court permitted J.S. to testify about the effects of the abuse contrary to State v. J.L.G., 234 N.J. 265 (2018) is misplaced. In J.L.G., the Court held "[e]xpert testimony about [Child Sexual Abuse Accommodation Syndrome] . . . may no longer be presented to juries" except in appropriate cases involving delayed disclosure. Id. at 308. The Court did not, as defendant contends, preclude a victim's testimony about the effects of the abuse.

Defendant's argument the court erred by failing to preclude the testimony pursuant to N.J.R.E. 403 is also unconvincing. J.S.'s testimony was relevant both to substantiate her testimony regarding the abuse and explain her delayed disclosure. The probative value was not substantially outweighed by the risk of undue prejudice.

E.

The court correctly denied defendant's motion for judgment of acquittal on the charge of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1).

> Motions for a judgment of acquittal are governed by Rule 3:18-1, which provides:
>
> > "At the close of the State's case . . . , the court shall, on defendant's motion or its own initiative, order the entry of a judgment of acquittal of one or more offenses charged in the indictment . . . if the evidence is insufficient to warrant a conviction."
>
> [State v. Tindell, 417 N.J. Super. 530, 548 (App. Div. 2011).]
>
> However, a trial court must deny the defendant's motion if "'viewing the State's evidence in its entirety . . . and giving the State the benefit of all its favorable testimony[,] as well as all of the favorable inferences[,] which reasonably could be drawn therefrom, a reasonable jury could find guilt . . . beyond a reasonable doubt.'"

[State v. Ellis, 424 N.J. Super. 267, 273 (App. Div. 2012) (omissions in original) (quoting State v. Wilder, 193 N.J. 398, 406 (2008)).]

"On appeal, we utilize the same standard as the trial court in determining whether a judgment of acquittal was warranted." Ibid. (citing State v. Felsen, 383 N.J. Super. 154, 159 (App. Div. 2006)). "[W]e apply a de novo standard of review," State v. Williams, 218 N.J. 576, 594 (2014), and "owe no deference to the findings of . . . the trial court." State v. Lodzinski, 249 N.J. 116, 145 (2021).

Pursuant N.J.S.A. 2C:24-4(a)(1), a person is guilty of endangering the welfare of a child in the second-degree only if the actor is "[a] person having a legal duty for the care of a child or who has assumed responsibility for the care of a child." "That responsibility may be legal and formal[,] or it may arise from informal arrangements." State v. Galloway, 133 N.J. 631, 661 (1999). That relationship must "justify the harsher penalties of the [second-degree] crime." State v. McInerney, 428 N.J. Super. 432, 443 (App. Div. 2012) (alteration in original) (quoting Galloway, 133 N.J. at 661). Such a relationship may be contrasted with that of "a person assuming only temporary, brief, or occasional caretaking functions, such as irregular or infrequent babysitting, [who] would be chargeable with child endangerment in the [third-]degree." Galloway, 133 N.J. at 661-62. The determination is fact-sensitive and is left for the jury, or the

trial judge on motion for dismissal or acquittal.  See McInerney, 428 N.J. Super. at 443.

Hoff testified defendant lived with her and J.S. for approximately one year and referred to defendant as "just like a stepdad."  She also testified he occasionally watched J.S. while she was out, including more than one occasion when she was at work for an eight-hour shift.  There is no doubt, giving the State the benefit of all favorable inferences, a jury could reasonably find defendant was a person who assumed a general and ongoing responsibility for the care of J.S. and was not someone assuming only temporary, brief, or occasional caretaking functions, such as irregular or infrequent babysitting.  The motion for judgment of acquittal was properly denied.

F.

Defendant's claim the court's jury instructions were erroneous lacks merit. Counsel did not object to the jury charge at the time, and we review for plain error.

A defendant must demonstrate "legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result."

State v. Singleton, 211 N.J. 157, 182-83 (2012) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)). Reviewing courts must read the charge "as a whole" to determine its overall effect rather than reading the challenged portions in isolation. State v. Garrison, 228 N.J. 182, 201 (2017).

Defendant contends the court initially mistakenly provided incorrect instructions as to two charges and then created confusion by recharging the jury correctly without explaining why. In fact, after discovering the error and discussing the matter with counsel, the court not only corrected the error, but explained to the jury there was a misstatement in the initial charges and it "needed to clarify that[,] which is the reason why [the court] re-read it." It also instructed the jury they would have a written copy of the charges in the jury room with the correct instructions. The court did not commit any error, much less plain error.

G.

We are unpersuaded by defendant's claim he is entitled to a new trial based on cumulative error. "[E]ven when an individual error or series of errors does not rise to reversible error, when considered in combination, their cumulative effect can cast sufficient doubt on a verdict to require reversal." State v. Jenewicz, 193 N.J. 440, 473 (2008). However, "[i]f a defendant alleges multiple

trial errors, the theory of cumulative error will still not apply where no error was prejudicial[,] and the trial was fair." State v. Weaver, 219 N.J. 131, 155 (2014). "When assessing whether [a] defendant has received a fair trial, we must consider the impact of trial error on [the] defendant's ability fairly to present [their] defense, and not just excuse error because of the strength of the State's case." Jenewicz, 193 N.J. at 473. Nevertheless,

> [t]rials, particularly criminal trials, are not tidy things. The proper and rational standard is not perfection; as devised and administered by imperfect humans, no trial can ever be entirely free of even the smallest defect. Our goal, . . . must always be fairness. "A defendant is entitled to a fair trial but not a perfect one."
>
> [State v. R.B., 183 N.J. 308, 333-34 (2005) (quoting Lutwak v. United States, 344 U.S. 604, 619 (1953)).]

Although defendant's trial was not perfect, we are satisfied, on the whole, it was fair.

### III.

We are not persuaded by defendant's contention the court misapplied its discretion by denying his motion for a new trial. "A trial court's ruling on a motion for a new trial 'shall not be reversed unless it clearly appears that there was a miscarriage of justice under the law.'" State v. Armour, 446 N.J. Super. 295, 305-06 (App. Div. 2016) (quoting R. 2:10-1). The motion "is addressed to

the sound discretion of the trial judge, and the exercise of that discretion will not be interfered with on appeal unless a clear abuse has been shown." Id. at 306 (quoting State v. Russo, 333 N.J. Super. 119, 137 (App. Div. 2000)).

Rule 3:20-1 states, "[t]he trial judge on defendant's motion may grant the defendant a new trial if required in the interest of justice." "[P]ursuant to Rule 3:20-1, the trial judge shall not set aside a jury verdict unless 'it clearly and convincingly appears that there was a manifest denial of justice under the law.'" Armour, 446 N.J. Super. at 305-06.

Defendant's claims of trial error lack merit. As a result, there is no basis to find the court mistakenly applied its discretion by denying his motion for a new trial.

## IV.

Defendant argues he was denied effective assistance of counsel because defense counsel "failed to raise any Brady violations until the middle of trial" and "failed to enforce the [c]ourt's subpoenas to cure this violation." "Our courts have expressed a general policy against entertaining ineffective-assistance-of-counsel claims on direct appeal because such claims involve allegations and evidence that lie outside the trial record." State v. Preciose, 129 N.J. 451, 460 (1992); State v. Sparano, 249 N.J. Super. 411, 419 (App. Div. 1991) ("Generally,

35

a claim of ineffective assistance of counsel cannot be raised on direct appeal."). We adhere to our general policy and decline to entertain defendant's ineffective assistance of counsel claim on direct appeal.

To the extent we have not addressed any remaining arguments, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2877-22